**In re ZACHMAN HOMES,
INC., Debtor.**

**Bankruptcy No. 4–83–1799.**

United States Bankruptcy Court,
D. Minnesota.

Nov. 30, 1984.

See also Bkrtcy., 40 B.R. 171.

John F. Markert, West St. Paul, Minn., for debtor.

Daniel Biersdorf, of Estes, Parsinen & Levy, Minneapolis, Minn., for Builders Finance and David C. Bell Investment.

Louis W. Brenner, of Brenner, Workinger & Thompson, Minneapolis, Minn., for Lyman Lumber and Sunrise Elec.

Irving Brand, and Rebecca Palmer, of Maslon, Edelman, Borman & Brand, Minneapolis, Minn., for Secured Creditors Mechanics Lien Claimants.

Gregory Pulles, of Mackall, Crounse & Moore, Minneapolis, Minn., for Unsecured Creditors' Committee.

## ORDER

MARGARET A. MAHONEY, Bankruptcy Judge.

A hearing was held before the undersigned on August 14, 15, 16, 17, 20 and 21 on Motion of the Mechanic's Lien Committee in the above bankruptcy case to determine the validity, priority and extent of mechanic's liens.

### Facts

The Debtor, Zachman Homes, Inc., (Zachman) is a developer/builder of residential housing units. Zachman filed for Chapter 11 protection on November 2, 1983. At the date of filing its bankruptcy petition, the Debtor had approximately 50 housing units in various stages of construction. To facilitate completion of these unfinished units, the Court established, via its order of December 29, 1983, and amended order of May 9, 1984, a procedure whereby the Debtor could complete and sell the housing units. The proceeds of sale of the units were first to be distributed to materialmen and laborers who provided work and materials after the date of the bankruptcy petition. Funds then were to go to the Debtor to cover its construction and selling costs. The remainder of the sale proceeds were deposited in an escrow fund for payment of pre-bankruptcy petition mechanic's liens and other encumbrances.

This procedure established by the Court also provided that the construction lender (D.C. Bell and/or B.T. Investors, Inc.) would receive from the closing proceeds the balance owing the lender on its construction mortgage with the Debtor. This amount due the mortgagee, (the principal and interest to the date of the sale), was payable to the mortgagee subject to the proviso that the Court at a later date would determine the relative priority of the construction mortgage in relation to various prepetition mechanic's lien holders.

For each housing unit sold, the Court's order further provided that the mortgagee and the Debtor were to escrow a sum of money to be applied toward the construc-

tion mortgagee's attorney's fees, to which the mortgagee claims an entitlement under the terms of its mortgage with the Debtor. The propriety of these fees was to be determined at a later date.

Several of the parties concerned filed standing ·objections to the procedure established by the Court in order to preserve their relative rights and to seek a final Court determination of the respective claims of the parties to the escrowed funds. The hearings held on the above dates dealt with several issues:

1. The relative priority of the construction mortgagee vis-a-vis the prepetition mechanic's lienholders.

2. The issue of the amount and validity of Lyman Lumber liens.

3. As to each parcel, the validity of all liens.

4. As to each parcel, the relative priority of all liens vis-a-vis the construction mortgage.

The principal parties in this case reached an agreement whereby the hearings on the above-mentioned dates were intended to constitute sample cases to determine the relative rights of the parties and perhaps obviate the need for further extended hearings on the remaining parcels. To facilitate this, the parties agreed to have these four cases, represented by at least one closed housing unit in each of the Debtor's four housing developments, heard by the Court. To that end, for purposes of this Order, each sample parcel will be treated separately.

First, however, it should be noted that certain facts have been stipulated to and applied to all four parcels. Those facts are the following:

1. Zachman Homes, Inc., was the owner of the land in each subdivision in question at all times relevant herein.

2. Zachman Homes was mortgagor on each construction loan at all relevant times.

3. Zachman and lender Bell agreed that Zachman would pay Bell's attorney's fees incurred by Bell in protecting and collect-

ing its money and position under the construction loan mortgage.

4. Zachman contracted with each mechanic's lien claimant to provide labor and materials for completion of the improvements on all premises either directly or through subcontractor Westwood Development.

5. Bell and B.T. properly perfected their construction mortgage loans on each subject parcel as of a certain date.

In order to achieve a better understanding of the general nature of Zachman's business, the process by which a subdivision is developed should be delineated.

1. Raw land is purchased by Zachman Homes.

2. The raw land is plotted into a subdivision by Westwood.

3. The setting of the grade stakes, surveying, and setting of boundary markers is done by Egan Field.

4. The rough grading operating performed by DLR subsequent to grade staking is done by Egan Field. DLR essentially first scrapes off all the topsoil from the land.

5. At or about the time DLR performs its work, Subterranean Engineering performs soil testing and field density tests on the projected subdivision. Should certain soil be determined to be unacceptable for housing, said soil is removed and replaced by other fill which is to be later compacted.

6. Water mains, gas mains, and sanitary sewer lines are installed, usually beneath what will eventually become the road in the subdivision. Usually, as a part of the operation, the services are run to each individual lot on the sewer and water. The water service is usually marked by a curb stop and a metal fencepost. The curb stop is usually located 15 feet from the projected curbline of the street. One curbstop per lot is the usual modus operandi.

7. The electrical conduit services are installed on each lot. The conduit service, which extends from the electrical main, is generally evidenced by approximately two feet of conduit protruding above the ground and staked with an iron fencepost.

8. The gas service is connected to each lot. The gas service is also marked by iron fenceposts.

9. After all the utility services have been run in, the street itself is installed.

Regardless of whether the street has been installed or is being worked on, Zachman often started the house construction itself. Sometime prior to the actual erection of the structure itself, the actual physical boundaries of the house itself are staked and graded into a relatively flat area known as a house pad.

At or about the time the final utilities are being installed and the house pad has been installed, Zachman then goes to the construction mortgagee to obtain mortgaged funds for construction of the house. On the day the mortgage is to be recorded on each individual lot, Guarantee Title Company takes photographs of the projected housing lot. Apparently after the mortgage has been placed on the property, the exact corners of the building itself are staked out by Hedlund Engineering.

With those common facts in mind, examination of each individual parcel is appropriate.

*Lake Eden East*

(Mortgage filed June 6, 1983)

The sample property in Lake Eden East is a condominium building with five closed units. The legal description of the closed units is as follows:

Building F, Unit 42, Lake Eden East Carriage Homes, Condominium No. 383, Lot 4, Block 1, Lake Eden East Addition, according to the recorded plat thereof.
Building F, Unit 44, Lake Eden East Carriage Homes, Condominium No. 383, Lot 4, Block 1, Lake Eden East, according to the recorded plat thereof.
Building F, Unit 46, Lake Eden East Carriage Homes, Condominium No. 383, Lot 4, Block 1, Lake Eden East, according to the recorded plat thereof.
Building F, Unit 47, Lake Eden East Carriage Homes, Condominium No. 383, Lot 4, Block 1, Lake Eden East, according to the recorded plat thereof.
Building F, Unit 48, Lake Eden Carriage Homes, Condominium No. 383, Lot 4, Block 1, Lake Eden East, according to the recorded plat thereof.

All these units are in Eden Prairie, Hennepin County, Minnesota. The construction mortgage of D.C. Bell was perfected through filing on June 6, 1983, in relation to these parcels.

The Debtor purchased the property underlying what later became known as Lake Eden East from the First National Bank of St. Paul in 1982. Lake Eden East is itself an entire development, not a replat of other larger developments as is the Debtor's normal course of business. The development itself is one block entitled "Block 1", divided into eight lots, upon each of which lots an eight-plex condominium building is built or was to be built. The Lake Eden East development is a planned-unit development, whereby the builder develops an area of land as a single entity according to a specified plan, such area containing planned unit residential developments. The builder presents the city with the completed project plan which the city must approve prior to any type of platting of the subdivision or construction thereon.

To accomplish this, Zachman contracted with Westwood Planning and Engineering Company on or about June 24, 1982, for Westwood to provide professional services to Zachman. Westwood's services consisted primarily of two separate functions. The first function was that of engineer of the platted subdivision. The engineering services were essentially in three phases, the first phase of which was preparation and drafting of the site itself and designing the site. These services included develop-

ing a site grading plan, preparing site grading specifications and relevant documents, and preparation of a FHA development plan. The second phase of Westwood's function was to prepare a utilities and street design. This phase consisted essentially of four parts, the first part of which was to design sanitary sewer, storm sewer and water main utilities and to prepare plans and specifications for their construction. The second part was to design street grades, and to prepare plans and specifications for street grade construction. The third part was to obtain necessary governmental agency approval of the utilities and street design. The fourth function was to assist Zachman in obtaining bids from subcontractors for providing grading, utilities, and street service.

The second general phase of services to be provided by Westwood included construction observation whereby Westwood actually provided an on-site engineer to oversee the general site grading, utilities, and street paving contractors in order to monitor the progress and quality of work being performed by those contractors. Westwood was further to provide a final inspection report to Zachman to determine if the conditions specified in the contract documents had been satisfied.

As part of the course of dealing between Westwood and Egan, Field and Nowak, Inc., Egan provided all surveying and rough staking services on Lake Eden East, including those for Lot 4, Block 1 as a joint venture with Westwood. The first work done by Egan on Lake Eden East was on April 19, 1982. That work consisted of preparing the final plat of the subdivision. Included in that work was the establishment of all boundary corners for the subdivision and the lots thereon. This was done by the placing of 12-inch by ¾-inch iron monuments on the corners of the lots. These monuments are marked with orange plugs and boundary stakes. On June 11, 1982, Egan began staking roads in the subdivision and staked the front lot corners of each lot. These lots corners were staked with lath with red ribbons on them. On that date, Egan also began staking the rear

lot corners of each lot. The rear corners were marked with the same evidence as the front corners.

From June through December of 1982, Egan continued to stake and survey on Block 1, Lake Eden East. In July, 1982, Egan rough-staked the garage for Lot 4, and marked said stakes with lath and ribbon. Stakes were destroyed as a matter of course by the grader doing the rough grade work. On July 7, 1982, Egan rough-staked the building pad on Lot 4 for establishment of a house pad on that lot. Contrary evidence shows the building pad on Lot 4 was staked on July 12, 1982, with all lot corners marked with the lath and ribbon. The work done on July 7 on Lot 4 was the rough-staking for the site grader. This was the extent of the work done on Lot 4, Block 1, Lake Eden East by Egan.

Zachman also contracted with DLR Construction Company to perform the excavation and site grading work on Lot 4, Block 1, and indeed on all of Lake Eden Subdivision. DLR agreed to clear and grub the raw land as well as perform all rough grading. This grading included both fill and subcutting of the land. In general, DLR's job was to clear all trees, shrubbery, etc., from the land, strip the topsoil from the land, pile the topsoil in a separate location, grade the individual lots to within a certain specification of final grade, and to prepare the house pads upon which the individual condominium units would be constructed. Lot 4, Block 1 was originally substantially below final grade level and DLR had to deposit a large amount (3–4 feet) of fill dirt on the lot to bring the lot close to final grade. This fill work was apparently done in the construction season of 1982. DLR began general grading and excess soil removal on Lake Eden East on June 14, 1982.

On or about May 19, 1982, Subterranean Engineering began work on the Lake Eden East subdivision. Subterranean is an engineering firm which conducts soil testing and surveying work. On May 19, Subterranean surveyed the entirety of Lake Eden

East and placed survey stakes throughout the subdivision. Subterranean also drilled test holes for field density on that date. Such test holes were circular holes dug in the ground, the diameter of which were approximately 12–18 inches. Upon removal of the dirt in the holes, the holes were refilled with white silica sand, topped with a conical shape of silica sand. Field density work may have actually been done on Lake Eden East on June 17, 1982.

As noted above, DLR worked under the direct supervision of Westwood Engineering. DLR also performed the rough grading of the street in Lake Eden East, such rough grading being completed in 1982.

On July 22, 1982, Kirkwold Construction contracted with Zachman Homes to install the utilities in Lake Eden East Subdivision. Such installation consisted of running a sewer main along Darnell Road and a water main along Darnell Road and connecting all lots on Block 1 with the mains through individual services run to each lot. Kirkwold began construction on Lake Eden East on July 28, 1982, and completed work on or about November 30, 1982. The services rendered the individual lots were run 10 to 15 feet inside the curb line (or 5–10 feet inside the lot line of each lot). The water service was then run to the surface of the soil via a curb stop, which is a cylindrical black metal shut-off valve approximately four inches in diameter. The height of the curb stop above the soil was set so that it was approximately flush with the sod, which was later to be installed on the land. Upon installation, each curb stop, (one to each lot in Block 1) was marked by a six-foot metal fencepost driven into the ground next to the curb stop. As a general rule, these fenceposts were driven three feet into the ground and therefore, three feet of the metal fencepost protruded from the ground. The general purpose of these fenceposts was to mark the location of the curb stop to prevent contractors from running over and/or burying the curb stops.

Kirkwold Construction also installed fire hydrants in the Lake Eden East Subdivision. Two such fire hydrants were installed, one on the lot line between Lots 1 and 2, and the second either on Lot 3, Lot 4, or on the lotline between the two. Such fire hydrants were installed in July of 1982.

Midwest Paving and Recycling Co., Inc., installed the streets and parking lots in Lake Eden East pursuant to contract with Zachman Homes. The original contract between the parties called for complete installation of the streets by August 15, 1982. The contract between the parties was subsequently modified to the extent that only the southerly one-third of the street was in final form by the end of 1982. At the end of 1982, the northerly two-thirds of the street in Lake Eden East was in sub-grade condition, that is, it was graded to a close proximity of final grade, but no asphalt, either sub-base or wearer course, had yet been installed.

The preparation of the streets entailed a five part construction process. The first part is the general rough grading. The second part is the installation and grading of gravel. The third part is the installation of the curbs and gutters. The fourth part is the paving of the subbase of the street. The final part is the installation of the wearer, or final, course of the blacktop. The streets in the upper two-thirds of Block 1 were apparently in the second stage, that is, no subgrade of gravel had yet been laid, and no blacktop had as of yet been laid as of the end of 1982. The evidence presented at the hearings on this matter indicates that the work done by Midwest on the Lake Eden streets in 1983 did not begin until June 8, 1983. Such work consisted of repairing the subgrade, adding the subbase asphalt and applying the wearing course.

According to the testimony of Charles Poppler, Westwood's senior engineer on the Lake Eden site, as of June 8, 1983, the house pad on Lot 4 had been excavated, and the trees had been totally cleared from the lot. The sewer and water lines were in to the property and the services were extended and visible on the property itself. According to the witness, it was evident

that substantial tree removal had been accomplished on that lot. Water service and curb stop were marked by the above-mentioned steel fenceposts. However, the witness was not on Lot 4 on June 6, 1983.

Bell's mortgage was filed as of record in the Office of the Registrar of Titles for Hennepin County, Minnesota, on June 6, 1983, as Document No. 1517336.

Testimony was presented as to the various lien claimants who worked upon the premises. Certain of the lien claimants filed mechanics lien statements against the property. These claimants are:

| | | |
|---|---|---|
| (1) | Westwood Planning and Engineering Co. | $2,213.50 |
| | (Westwood filed two liens for the same amount of money) | $2,213.50 |
| (2) | Egan, Field & Nowak, Inc. | $14,045.88 |
| (3) | Fred W. Pagenkopf | $800.00 |
| (4) | Midwest Paving & Recycling Co., Inc. | $34,095.91 |
| (5) | Ray N. Welter Heating Co. | $1,420.00 |
| | (and a second lien) | $473.50 |
| (6) | Meister Plasha Excavation | $1,710.25 |
| (7) | Rocket Crane Service | $269.50 |
| (8) | Sunrise Electric | $45,530.48 |
| (9) | Lyman Lumber Co. | $50,062.06 |
| | (later amended to $68,635.78) | |

All of these lien claimants also filed bills of particular pursuant to the Court Order dated December 8, 1983, and amended May 9, 1984. No other lien claimants filed bills of particular or mechanics lien statements.

The title examiner, appointed by the Court, Mr. J. Robert Nygren, prorated the mechanics lien of Lyman Lumber over the entire condominium project, per Minn.Stat. 515A4–109 relating to condominiums. Mr. Nygren also allocated on a pro rata basis the lien of Midwest Paving & Recycling Co., Inc., since the lien was a blanket lien. The same was done with Meister Plasha Excavation Co.'s lien. The title examiner denied the claim of Westwood Planning since he felt the legal description was not clear. The same reason for denial of Egan Field & Nowak's claim was given by the title examiner. Sunrise Electric's claim was denied for the same reason. The legal description used in all three cases stated "Lot 4, Block 1, Lake Eden East Addition"

with no specific mention of Building F. In the final examiner's report, the examiner allowed only the following claims:

### As to Unit 42:

| | | |
|---|---|---|
| 1. | Lyman Lumber | $7,268.29 |
| 2. | Fred W. Pagenkopf | $100.00 |
| 3. | Midwest Paving & Recycling Co., Inc. | $1,065.50 |
| 4. | Meister Plasha Excavation | $53.44 |

### As to Unit 43:

| | | |
|---|---|---|
| 1. | Lyman Lumber Co. | $7,268.29 |
| 2. | Fred W. Pagenkopf | $100.00 |
| 3. | Midwest Paving & Recycling Co., Inc. | $1,065.50 |
| 4. | Meister Plasha Excavation | $53.44 |

### As to Unit 44:

| | | |
|---|---|---|
| 1. | Lyman Lumber Co. | $7,268.29 |
| 2. | Fred W. Pagenkopf | $100.00 |
| 3. | Midwest Paving & Recycling Co., Inc. | $1,065.50 |
| 4. | Meister Plasha Excavation | $53.44 |

### As to Unit 46:

| | | |
|---|---|---|
| 1. | Lyman Lumber Co. | $7,268.29 |
| 2. | Fred W. Pagenkopf | $100.00 |
| 3. | Midwest Paving & Recycling Co., Inc. | $1,065.50 |
| 4. | Meister Plasha Excavation | $53.44 |
| 5. | Rocket Crane Service | $269.50 |

### As to Unit 47:

| | | |
|---|---|---|
| 1. | Lyman Lumber Co. | $7,268.29 |
| 2. | Fred W. Pagenkopf | $100.00 |
| 3. | Midwest Paving & Recycling Co., Inc. | $1,065.50 |
| 4. | Meister Plasha Excavation | $53.44 |

### As to Unit 48:

| | | |
|---|---|---|
| 1. | Lyman Lumber Co. | $7,268.29 |
| 2. | Fred W. Pagenkopf | $100.00 |
| 3. | Midwest Paving & Recycling Co., Inc. | $1,065.50 |
| 4. | Meister Plasha Excavation | $53.44 |

Defendant David C. Bell introduced evidence which showed that Midwest Paving & Recycling Co., Inc. had been paid and released its lien against Unit No. 47 of Building F, Condominium # 383 (Bell Exhibit 1), against Unit No. 48 (Bell Exh. 2), against Unit No. 46 (Bell Exh. 3), against Unit No. 44 (Bell Exh. 4), and against Unit No. 43 (Bell Exh. 5).

The general manager of Midwest Paving & Recycling Co. testified that the Debtor and Midwest had an arrangement as to the Lake Eden East project to allow payment of a pro rata portion of Midwest Paving's lien as each unit was sold.

Lyman Lumber filed a lien claim for $50,-062.00 for the Lake Eden East 8 unit condominium. It later amended its claim to $68,635.78. Mr. Allar of Lyman Lumber testified that the bid price for similar condominium units was $60,070 which did not include extras. Lyman Lumber provided sheetrock and other extras to the building. The sheetrock value was approximately $29,000.00. The lien claims were filed for retail prices of materials and included monthly service charges. Mr. Zachman testified that the sheetrock per unit should cost about $1,200 or $9,600 per 8 unit condominium.

Lyman Lumber's lien claim was filed for the retail price of its materials and for service charges. Lyman Lumber usually provided materials to Debtor at a lower bid price which was usually approximately 15% below retail price. However, if Lyman Lumber wasn't paid immediately, a lien was filed for the retail price. Lyman Lumber and Debtor usually settled liens for the net or bid price plus the accrued monthly service charges. Except on the Woodcliff Addition, Lyman Lumber never agreed to a proration of their lien claim on a unit by unit basis.

### Cinnamon Ridge Third Addition
### (Mortgage filed May 11, 1983)

The second subject parcel is one of two attached twin homes situated on that property in Dakota County, Minnesota, legally described as:

> That part of Lot 5, Block 3, Cinnamon Ridge Third Addition lying Northeasterly of a line drawn from a point on the Southeasterly line of said Lot 5, Distant 40.00 feet Southwesterly of the most Easterly corner thereof to a point on the Northwesterly line of said Lot 5, Distant 40.00 feet Southwesterly of the most Northerly corner thereof.

The property is more commonly known as 4450 Slater Road, Eagan, Minnesota. Bell's mortgage on this property was filed for record in the Office of the Registrar of Titles for Dakota County, Minnesota, on May 11, 1983, as Document No. 623154.

Cinnamon Ridge Third Addition was originally platted as Outlot B, Cinnamon Ridge. Cinnamon Ridge Third Addition was replatted as such on July 23, 1982. The property was originally purchased by Zachman from Hillcrest Development. Cinnamon Ridge Third Addition is also a planned unit development.

As with Lake Eden East, Cinnamon Ridge Third Addition had as its site engineer Westwood Engineering. Westwood's services on Cinnamon Ridge were essentially equivalent to services performed on Lake Eden East, with the main difference that Westwood only oversaw the site grading of this parcel. The relationship between Zachman and Westwood is governed by a July 20, 1982 contract between the parties. In that contract the duties of Westwood are laid out into three phases. The first phase is that of developing a site grading plan and preparing the specifications and documents relevant to such. The second phase involves the construction observation in regard to the site grading contractors to determine the progress and quality of their work. Also Westwood was to conduct final inspections under the construction supervision phase. The third phase is the surveying services to be performed by Westwood. This phase required Westwood as surveyor to set all the iron pipes for the rear corner property lots and outlot corners and to provide two complete sets of grade and alignment stakes for the overall outlot development. This staking included street stakes, house pad staking, and property line staking with lath.

Again, Egan, Field was the joint venturer with Westwood to the extent that Egan, Field did all of the actual rough staking and surveying of Cinnamon Ridge Third. The entire Cinnamon Ridge Subdivision is so situated that in order to make the entire addition acceptable for housing, much fill dirt had to be moved from Outlot A to Outlot B, which later became Cinnamon Ridge Third, and to Outlot C. The majority of this removal and deposit of fill dirt occurred in 1981. Most of the fill dirt for Cinnamon Ridge Third Addition came from

the Cinnamon Ridge Second Addition. In addition, DLR Construction installed a drainage swale behind the Lots 4 and 5 of Block 3 of Cinnamon Ridge Third Addition in 1981 to facilitate drainage from Cinnamon Ridge. Lot 5 itself received a substantial amount of fill in 1981. The soil alteration work, the fill, was evident on May 11, 1983.

Pursuant to a contract signed July 26, 1982, DLR Construction performed all of the clearing, grubbing, cutting, filling and transportation of dirt along with doing the rough and final grade of both the entire subdivision and individual house pads in Cinnamon Ridge Third Addition. DLR's work was performed from July through September of 1982. The house pad was installed and evident on the lot by May 11, 1983. In conjunction with this work, Egan Field performed staking functions on Cinnamon Ridge Third Addition. Said staking began July 6, 1982. The sewer and water mains and services were installed on Cinnamon Ridge Third Addition by or under the direct supervision of the City of Eagan. All the mains and services were in and completed by the end of November, 1982. At least on that date, the water service was marked by a steel fencepost. Said fencepost was placed immediately adjacent to the water shut-off valve. The subgrade preparation of Slater Road began May 4, 1983. No curbing on Slater Road was done prior to May 11, 1983. Testimony of Mr. Richard Hefti revealed that on May 11, 1983, the six-foot fence posts were probably visible on each lot, the manholes in the streets were installed and visible and the curb stop was probably evident on each lot. (Page 38)

Subterranean Engineering did the soil testing, foundation design, and earthwork monitoring on Cinnamon Ridge Third Addition. Subterranean originally did ten soil borings on March 4, 1981. An additional four soil borings were done in July and August 1981 along with general field work and surveying in August and July of 1981. Subterranean further monitored the earthwork and testing throughout the months of June 1983 along with supervision of the

cutting and filling operation ongoing at that time by either Frattalone Construction or DLR Construction.

The actual lot staking on Cinnamon Ridge Third Addition was done by Hedlund Engineering Services, Inc. The testimony presented by Mr. Lindgren from Hedlund Services indicates that at the time he staked Lot 5, Block 3 of Cinnamon Ridge Third Addition on May 23, 1983, the water shut-off was in and marked by a steel fencepost some five to ten feet from the boundary of the property. The gas, electric and phone services were also in and visible, and the ground had been visibly altered.

Some of the lien claimants who worked on the Cinnamon Ridge Third project, specifically Lot 5, Block 3, filed mechanics lien statements in regard to their work. These claimants who filed mechanics lien statements and the amounts of the liens are:

| | | |
|---|---|---|
| 1. | F.C. Hayer Co. | $1,203.36 |
| 2. | J & W Asphalt Construction, Inc. | $9,544.59 |
| 3. | Genz-Ryan Plumbing & Heating, Inc. | $525.00 |
| 4. | Robert Doheny Construction | $610.00 |
| 5. | Automatic Garage Door Co. | $3,130.00 |
| 6. | Meister Plasha Excavation | $726.00 |
| 7. | Stuart Interiors, Inc. | $1,322.64 |
| 8. | Selby Ornamental Iron Co. | $158.00 |
| 9. | Lyman Lumber Co. | $11,864.49 |
| 10. | Orv Bakke Insulation Co. | $1,082.00 |

The following mechanics lien claimants filed bills of particular with the title examiner, Mr. J. Robert Nygren, but did not file mechanics lien statements. These claimants who filed bills of particular are:

| | | |
|---|---|---|
| 1. | Total Asphalt | $6,112.74 |
| 2. | Subterranean Engineering | $3,533.12 |
| 3. | Westwood Planning & Engineering | $4,157.24 |
| 4. | Egan Field & Nowak | $26,169.78 |

Lyman Lumber Co., Robert Doheny Construction, and Genz-Ryan Plumbing & Heating, Inc., filed both bills of particular and mechanics lien statements.

The title examiner, in his final examiners report as to Lot 5, Block 3, Cinnamon

Ridge, allowed the following mechanics lien claimants' claims:

1. Lyman Lumber Co.          $5,932.45
2. J & W Asphalt Construction, Inc.   $682.00
3. Genz-Ryan Plumbing & Heating, Inc.   $525.00
4. Robert Doheny Construction     $610.00

The examiner prorated the bill of Lyman Lumber Co. and allocated one half of its lien amount to the twin home built on this lot. Westwood Planning & Engineering's claim was excluded because the abstract did not show its filed mechanics lien. Egan Field & Nowak was excluded for the same reason. Subterranean Engineering was excluded since no mechanics lien statement had been filed. This was also true of Total Asphalt.

The Preliminary Examiner's Report included the following claims:

1. Automatic Garage Door     $325.50
2. Grone Electric         $508.00
3. Genz-Ryan           $175.00
4. Mahowald            $450.00
5. Lyman Lumber      $9,328.35
6. Meister             $726.00
7. Welter Heating       $40.41

Grone-Electric, Mahowald and Welter Heating's claims were not included in the Final examiner's Report as they furnished no filed Mechanics' Lien Statements and/or Bills of Particular. Mr. Zachman testified that they completed the work required and furnished the materials required to substantiate the value of their claims.

Lyman Lumber's lien claim was filed for the retail price of its materials and for service charges. Lyman Lumber provided materials to Debtor at a lower bid price which was usually approximately 15% below retail price. However, if Lyman Lumber wasn't paid immediately, a lien was filed for the retail price. Lyman Lumber and Debtor usually settled liens for the net or bid price plus the accrued monthly service charges. Except on the Woodcliff Addition, Lyman Lumber never agreed to a pro ration of their lien claim on a unit by unit basis.

*Fox Glen Third Addition*
(Mortgage filed March 26, 1983)

This property consists of the two attached twin homes (Unit A and Unit B) situated on:

Lot 1, Block 1, Fox Glen Third Addition, Hennepin County, Minnesota. The address of said property is 14025 and 14035 36th Avenue North, Plymouth, Minnesota.

The mortgage on this property is held by BT Investors, Inc. Said mortgage was filed for record in the Office of the Registrar of Titles for Hennepin County, Minnesota, on March 26, 1983, as Document No. 4796082. Zachman purchased this property in 1982. This property was an original plat. This parcel is also a planned unit development.

Westwood Engineering was the site engineer on this property. Westwood oversaw installation of sewer, water, utilities, and street construction pursuant to a September 22, 1982 contract with Zachman Homes. The contract called for Westwood to first do site design, and utilities and street design. This included preparation of a site grading plan and specifications preparation of an FHA development plan, designing a sanitary sewer and storm-sewer water main and street grades, and assisting Zachman in obtaining bids from subcontractors. Engineering services also included supervision of all of the on site grading, site utilities and street paving contractors. Westwood was also required by contract to prepare a final plat and to set the iron monuments marking the lot corners. Westwood was also required to set grade and alignment stakes for the mass excavation of Fox Glen, including setting street stakes, house pad stakes, and property line stakes. All of these were marked with lath. Westwood was also to provide storm sewer, sanitary sewer, water line, and curb stakes.

Egan, Field, Nowak was a joint venturer on this project to do the actual surveying and staking for Westwood and Zachman. The site grading, done by DLR Construc-

tion, Inc., commenced October 25, 1982. All of the lot corners in the Fox Glen Addition were staked by Eagan Field on October 26, 1982. Installation of sanitary sewer main and services commenced November 3, 1982. Utility work, including sanitary sewer, was performed by QRS Construction.

Subterranean Engineering also did the soil testing, foundation design and earthwork monitoring on Fox Glen Third Addition. The initial soil investigation began on October 13, 1982, with surveying and staking. DLR stripped the topsoil from Fox Glen Third Addition in October of 1982 under the supervision of Subterranean and Westwood. Apparently cuts were made on Lot 16 by the rough grader in October of 1982, said dirt being deposited elsewhere in the Fox Glen Subdivision. Substantial cuts, of up to three feet in depth, were made by DLR on this lot. Sewer and water service, curbs, electrical service, and gas service were not installed on Fox Glen Third Addition, Lot 16, Block 1, until after the spring of 1983 and after the affixing of B.T.'s mortgage on this property.

Midwest Paving also did the streets in Fox Glen Third Addition, paving apparently occurring after the affixing of B.T.'s mortgage.

Some of the mechanics lien claimants who furnished work to the Fox Glen property filed mechanics lien statements. The lien claimants who filed mechanics lien statements and the amounts of their claims are as follows:

| | | |
|---|---|---|
| 1. | Elk River Ready Mix | $1,300.00 |
| 2. | Donald L. McCarty | $1,400.00 |
| 3. | Federal Lumber Co. | $24,562.98 |
| 4. | Midwest Paving & Recycling Co., Inc. | $42,786.53 |
| 5. | Westwood Planning & Engineering Co. | $4,196.97 |
| 6. | Subterranean Engineering | $361.98 |
| 7. | Meister Plasha Excavation | $2,787.00 |
| 8. | Rocket Crane Service | $196.00 |
| 9. | Ray N. Welter Heating & Plumbing | $2,185.00 |
| | and a second lien | $2,185.00 |
| 10. | David C. Edgett | $300.00 |
| | (also filed a second lien) | $300.00 |

The only bills of particulars filed pursuant to the Court's Standing Order of December 8, 1983 as amended May 9, 1984, were persons who had also filed mechanics lien statements.

The title examiner, in his final report, allowed the following liens as to Fox Glen—Lot 16, Block 1, Unit A:

| | | |
|---|---|---|
| 1. | Elk River | $641.44 |
| 2. | Subterranean Engineering | $36.00 |
| 3. | Westwood Planning & Engineering Co. | $350.00 |
| 4. | Federal Lumber | $12,157.84 |
| 5. | Donald L. McCarty | $700.00 |

The title examiner's report as to Lot 16, Block 1, Unit B listed the following valid claims:

| | | |
|---|---|---|
| 1. | Elk River | $641.44 |
| 2. | Westwood Planning & Engineering | $350.00 |
| 3. | Federal Lumber | $12,157.84 |
| 4. | Donald L. McCarty | $700.00 |

The lien of Subterranean Engineering was disallowed as to Lot B as it was shown as satisfied by a satisfaction filed June 24, 1984, as Document No. 0049752 filed in Hennepin County. Elk River's lien, Donald McCarty's lien, Subterranean's lien, Westwood's lien, and Federal Lumber's lien were all prorated either for the entire subdivision (Subterranean) or between the two twin homes on Lot 1, Block 1.

In the Title Examiner's Preliminary Report as to Unit B, Westonka was allowed a lien of $699.00. Master Plumbing was allowed a lien of $200.00. Hedlund was allowed a lien of $65.00 and Expert was allowed a lien of $1,400.00. All of these liens were disallowed in the Final Examiner's Report for failure to file a Mechanic's Lien Statement and/or a Bill of Particulars.

As to Unit A, the Preliminary Examiner's Report allowed claims for the same entities as in Unit B above. All of these lien claims were disallowed in the Examiner's Final Report.

Mr. Zachman testified that the claimants who were disallowed had performed the work required and furnished the required

materials to substantiate the value of their claims.

### Woodcliff Fourth Addition
### (Mortgage filed June 2, 1983)

This property consists of one half of a twin home situated on:

Lot 2, Block 1, Woodcliff Fourth Addition, according to the recorded plat thereof.

The property is commonly known as 2550 Coppercliff Trail, Woodbury, Minnesota. David C. Bell Investment Company holds a construction mortgage on said property. The mortgage was filed for record in the Office of the County Recorder for Washington County, Minnesota, on June 2, 1983, as Document No. 446326.

Woodcliff Fourth Addition was originally platted as Outlot C, Woodcliff by Zachman. Said replatting occurred on May 11, 1983.

Westwood was the site engineer for this project, overseeing all site grading operations. Westwood's work was governed by contracts executed February 16 and 17, 1981. To this end, Westwood conducted work in the following manner: it prepared a site drainage study, prepared a grading plan and specifications, prepared an FHA development plan, and solicited bids from subcontractors. It also generally oversaw grading construction. Westwood was also responsible for surveying and staking in both the final plat and setting iron pipes for lot corners and subdivision corners. Westwood also was responsible for grade and alignment stakes for the mass excavation, for street lath stakes, for house pad stakes, and for property line stakes. All the surveying and staking was actually done by Egan, Field.

The city of Woodbury was responsible for the actual installation and construction of utilities, water, and streets. Said improvements were apparently not installed on Woodcliff Fourth Addition until late in the construction season of 1983.

The rough grading work in Block 1 Woodcliff Fourth apparently took place in 1982 when the rough grading was being done in Woodcliff Second by Dependable. In July of 1982, the house pad was apparently graded on Lot 2, Block 1, Woodcliff Fourth Addition. This house pad was installed upon a base of approximately four feet of fill dirt. The plat of Woodcliff Fourth Addition had not yet been completed on that date. The reason for grading and laying the house pad on Woodcliff Fourth Block 1 at that time was due to the great amount of fill required on that block, and the possible structural damage to other buildings nearby should such fill and its subsequent compaction take place at a time when completed houses were nearby.

The road construction in Woodcliff Fourth Addition did not occur until late in the summer of 1983. The roads were installed by Bituminous Roadways. The City of Woodbury was responsible for the public improvements and streets generally. N-Con Utilities was responsible for installation of the sewer and water mains and services. In early June of 1983, the utilities were apparently only extended into Woodcliff Fourth to 10–20 feet past the plat line on Woodcliff Second. The utilities were lying in the middle of what was to be Coppercliff Trail. The road itself, Coppercliff Trail, apparently ended at the plat line dividing Woodcliff Second and Woodcliff Fourth. The lot line on the subject lot was staked out in May of 1982 when substantial work was being performed on Woodcliff Second. Any further staking of Woodcliff Fourth did not occur until at least June 14, 1983.

A swale apparently had been dug by DLR on or adjacent to Blocks 1 and 2 Woodcliff Fourth Addition in 1981 or 1982. Further, on June 7, 1983, site grading was done on all of Woodcliff Fourth.

Some of the mechanics lien claimants filed mechanics lien statements in regard to this property. The names of those claimants who filed mechanics liens and the amounts of their liens are as follows:

1. DLR Construction      $40,193.85
2. Egan Field & Nowak, Inc.      $4,348.63
3. Westwood Planning & Engineering      $4,139.61

| | |
|---|---|
| 4.   Rocket Crane Service, Inc. | $367.50 |
| 5.   Ray N. Welter Heating Co. | $2,065.00 |
| 6.   Lyman Lumber Co. | $28,715.17 |

Genz-Ryan Plumbing & Heating Co. furnished information (invoices) to the examiner which was not in the form of a bill of particulars but did not file a mechanics lien statement. Its claim was in the amount of $2,466.00. All other bills of particulars were filed by claimants who had also filed mechanics lien statements. These persons are Rocket Crane Service Co., Westwood Planning & Engineering, Lyman Lumber Co., Egan Field & Nowak Co., and Ray N. Welter Heating Co.

The examiner, in making his final title examination, allowed the following mechanics lien claims:

| | |
|---|---|
| 1.   Lyman Lumber Co. | $14,375.10 |
| 2.   Ray N. Welter Heating Co. | $2,065.00 |
| 3.   Westwood Planning & Engineering Co. and Egan Field & Nowak, Inc. (for both) | $350.00 |
| 4.   DLR Construction | $536.00 |
| 5.   Rocket Crane Service, Inc. | $183.50 |

The title examiner prorated Lyman Lumber Co.'s lien and allowed one half to be allocated to this one side of a twin home. Westwood Planning & Engineering Co. and Egan Field & Nowak, Inc.'s lien was prorated for the entire subdivision.

The Preliminary Examiner's Report allowed claims for work done by:

| | |
|---|---|
| 1.   Hedlund | $102.87 |
| 2.   Lyman Lumber | $8,000.00 |
| 3.   Always Insulation | $519.00 |
| 4.   Genz-Ryan | $1,300.00 |
| 5.   Welter Heating | $2,065.00 |
| 6.   Sand Fill | $300.00 |
| 7.   Westwood (Egan) | $350.00 |
| 8.   DLR | $536.00 |

The claims of Hedlund, Always Insulation, and Sand Fill were later deleted from the Final Examiner's Report because they furnished no filed Mechanics' Lien Statement and/or Bills of Particulars.

Mr. Zachman testified that they completed the work required and furnished the materials required to substantiate the value of their claims.

Lyman Lumber's lien claim was filed for the retail price of its materials and for service charges. Lyman Lumber provided materials to Debtor at a lower bid price which was usually approximately 15% below retail price. However, if Lyman Lumber wasn't paid immediately, a lien was filed for the retail price. Lyman Lumber and Debtor usually settled liens for the net or bid price plus the accrued monthly service charges. Except on the Woodcliff Addition, Lyman Lumber never agreed to a pro ration of their lien claim on a unit by unit basis.

## DISCUSSION

### A. *Priority Between Construction Mortgagee and Prepetition Mechanic's Lienholders*

Under the facts of this case, the question of the relative priority of claims between the construction mortgagees, D.C. Bell and B.T. Investors, Inc., and the prepetition mechanics lienholders calls for extensive consideration of the applicable legislation and supporting case law. The mortgagees persuasively contend that in each instance the actual and visible beginning of the improvement on the ground, at which time all mechanic's liens attach for purposes of priority, occurred subsequent to the recordation of the construction mortgages. Citing extrajurisdictional authority interpreting Minnesota case law, they argue in essence that all pre-mortgage work performed on the building sites merely constituted preparation for the actual improvements. Despite the construction mortgagees' persuasive discourse, an exhaustive review of the relevant authorities mandates a contrary holding.

The time at which all mechanic's liens attach is governed by Minn.Stat. § 514.05.[1]

---

1.   Section 514.05 provides in full:
All such liens, as against the owner of the land, shall attach and take effect from the time the first item of material or labor is furnished upon the premises for the beginning of the improvement, and shall be preferred to any mortgage or other encumbrance not then of record, unless the lienholder had

That section provides that as against a mortgagee "no lien shall attach prior to the actual and visible beginning of the improvement on the ground." Minn.Stat. § 514.05 (1982). To understand just what the legislature intended by its reference to an "actual and visible beginning of the improvement," it is helpful to refer to Minn.Stat. § 514.01.[2] That section defines "contribut[ing] to the improvement of real estate" as the performing of labor, or furnishing of skill, material or machinery for any of the following purposes:

> for the erection, alteration, repair or removal of any building, fixture, bridge, wharf, fence, or other structure thereon, or for grading, filling in, or excavating the same, or for clearing, grubbing, or first breaking, or for furnishing and placing soil or sod, or for furnishing and planting of trees, shrubs, or plant materials, or for labor performed in placing soil or sod, or for labor performed in planting trees, shrubs, or plant materials, or for digging or repairing any ditch, drain, well, fountain, cistern, reservoir, or vault thereon, or for laying, altering or repairing any sidewalk, curb, gutter, paving, sewer, pipe, or conduit in or upon the same, or in or upon the adjoining half of any highway, street, or alley upon which the same abuts.

Minn.Stat. § 514.01 (1982).

A common sense reading of section 514.05 in conjunction with section 514.01 yields a broad interpretation of an "actual and visible beginning of the improvement" that includes such lienable items as are incorporated into the § 514.01 definition.

■ Additional support for a broad interpretation of the § 514.05 language can be found in a 1974 amendment to section 514.-05 itself. That amendment provided in part that "[e]ngineering or land surveying services with respect to real estate shall not constitute the actual and visible beginning of the improvement on the ground referred to in this section, *except when such engineering or land surveying services include a visible staking of the premises.*" Act of April 9, 1974, ch. 381, § 2, 1974 Minn.Laws 683 (codified as amended at Minn.Stat. § 514.05 (1982)) (emphasis added). While the purpose behind this amendment is not entirely clear on its face, it does explicitly provide that a *visible staking* of the premises in connection with

---

actual notice thereof. As against a bona fide purchaser, mortgagee, or encumbrancer without notice, no lien shall attach prior to the actual and visible beginning of the improvement on the ground, but a person having a contract for the furnishing of labor, skill, material, or machinery for such improvement, may file for record with the county recorder of the county within which the premises are situated, or, if claimed under section 514.04, with the secretary of state, a brief statement of the nature of such contract, which statement shall be notice of his lien. Engineering or land surveying services with respect to real estate shall not constitute the actual and visible beginning of the improvement on the ground referred to in this section, except when such engineering or land surveying services include a visible staking of the premises. No lien shall attach for engineering or land surveying services rendered with respect to a purchaser for value if the value of those services does not exceed $250.
Minn.Stat. § 514.05 (1982).

**2.** Section 514.01 provides in full:
Whoever performs engineering or land surveying services with respect to real estate, or contributes to the improvement of real estate by performing labor, or furnishing skill, material or machinery for any of the purposes hereinafter stated, whether under contract with the owner of such real estate or at the instance of any agent, trustee, contractor or subcontractor of such owner, shall have a lien upon the improvement, and upon the land on which it is situated or to which it may be removed, that is to say, for the erection, alteration, repair or removal of any building, fixture, bridge, wharf, fence, or other structure thereon, or for grading, filling in, or excavating the same, or for clearing, grubbing, or first breaking, or for furnishing and placing soil or sod, or for furnishing and planting of trees, shrubs, or plant materials, or for labor performed in placing soil or sod, or for labor performed in planting trees, shrubs, or plant materials, or for digging or repairing any ditch, drain, well fountain, cistern, reservoir, or vault thereon, or for laying, altering or repairing any sidewalk, curb, gutter, paving, sewer, pipe, or conduit in or upon the same, or in or upon the adjoining half of any highway, street, or alley upon which the same abuts.
Minn.Stat. § 514.01 (1982).

engineering or land surveying services shall constitute the requisite beginning of the improvement. A plain reading of the overall section indicates a fairly clear expression of legislative intent that at least where lienable items of labor are fundamental to the improvement, such items, when visible, shall constitute "actual and visible beginnings of the improvement," despite the fact that the actual erection of the improvement has not begun.

Consideration of a 1974 section 514.01 amendment, which was a companion to the above section 514.05 amendment, and records of committee hearings on both amendments demonstrates that the above statutory interpretation is, indeed, consistent with legislative intent. Section 514.01 was amended as part and parcel with section 514.05 to include, as persons entitled to mechanics liens, those performing "engineering or land surveying services with respect to real estate." Act of April 9, 1974, ch. 381, § 1, 1974 Minn.Laws 683 (codified as amended at Minn.Stat. § 514.01 (1982)). Senator Humphrey testified as follows concerning the purpose behind early drafts of the two amendments:

> [T]hose who want to have mechanic's lien ... must show not only that the real estate has been improved and that he has supplied the labor and materials for the improvement, but also that the labor and materials were supplied for one of the purposes stated in the statute. The statute [section 514.01] does not at this time refer and has not been interpreted to refer to those additional improvements which the land surveyor and engineer give to the property.
>
>     . . . .

Since the improvement of the survey and perhaps of the engineering projects are not visible in many instances or are only slightly visible by the posts or whatever are put in by the surveyor, what this amendment [section 514.05] does is it limits the right of notice and the right of the lien to those who file at the county ... to the register of deeds in the county.

>     . . . .

> [T]he problem is that we have the situation where in the instance where you can see the building going up, we say yes its perfectly all right to have the [mechanic's lien] remedy. Where we don't see the building going up and yet we have done something that is absolutely fundamental to any improvement of property—and that is an accurate survey or proper engineering—we say no you can't have the remedy. That's unjust if you ask me.

*Hearing on S.F. 1483 Before the Senate Committee on the Judiciary* (February 26, 1974) (statement of Senator Humphrey).[3] At this preliminary stage of the legislative process, it is clear that the amendments were intended merely to create the right to a mechanic's lien for engineers and land surveyors and to require those seeking to exercise that right to file a statement as to such with the county recorder.

Significantly, however, the early Senate draft of section 514.05 omitted in relevant part important language which was subsequently appended to the amendment by the House Judiciary Committee prior to enactment. In the Senate's original draft form the amendment stated only that, "Engineering or land surveying services with respect to real estate shall not constitute the actual and visible beginning of the im-

---

**3.** On March 6, 1974, the Senate resolved itself into a Committee of the Whole. At this time Senator Humphrey introduced the Senate draft of the amendments to the Senate floor as follows:

> I would note that the Supreme Court in a recent decision has recognized the fact that land surveyors and engineers do provide improvements to the land in their services. But because the statute does not explicitly and expressly state their services as being services

which can have the remedy of a lien, the court has determined that the lien does not apply and that there is no right to it. And so in a sense, what we're trying to do here is just place them on equal footing with other persons that provide improvements to the property.

*Hearing on S.F. 1483 Before the Senate Committee of the Whole* (March 6, 1974) (statement of Senator Humphrey).

provement on the ground referred to in this section." Upon reference of the amendment to the House of Representatives, though, the Senate language was itself amended to read in relevant part that such services shall not constitute the actual and visible beginning of the improvement, "except when such engineering or land surveying services include a visible staking of the premises."

In a revealing statement to the House Judiciary Committee, Representative Lindstrom explained the reason behind the addition of the House language to the Senate bill:

> The problem today is this bill will ... apparently the engineers and land surveyors would like to get a lien for their work. The law today is that the actual and visible beginning of the improvement on the ground when there is a staking— [sic] and so they [the engineers and land surveyors] create the lien for those who file liens later, but they themselves don't get a lien. If you pass this bill ... [without the addition of the House amendment], you're saying engineering or land services with respect to real estate shall not constitute that visible beginning of the improvement on the grounds, and they don't want to change the present law. They want that to remain the same, but want to be able to get a lien.... [The question is are survey or engineering stakes] sufficiently visible so that ... the mortgage company is aware somebody has performed a [inaudible] on this ground. And if I want to place any mortgage, I'd better

see what it is. And so that's the reason for the [House] amendment—not to change the present law but simply give these people a lien as they perform their [sic] services.

*Hearing on S.F. 1483 Before the House Committee on the Judiciary* (March 14, 1974) (statement by Representative Lindstrom). Moreover, in response to whether the amending House language would make an engineer's lien prior to a mortgagee's, the Representative remarked: "They will be prior, as all other lien items are prior, providing there's an actual and visible improvement on the grounds that the mortgage company should have observed when it places [sic] the mortgage. So they're in the same position [as they would be under the present law]." *Id.*

The statutory wording of sections 514.01 and 514.05, as illuminated by the 1974 amendments and their legislative history, evinces a clear intent to protect the interests of all mechanic's lien claimants over those of the mortgagees as of the time the first item of lienable labor contributes to the improvement on the ground in a manner reasonably visible to such mortgagees. Section 514.05 draws no distinction between preparatory work and labor contributed to the actual erection of the improvement. Moreover, it would be materially inconsistent to allow liens to attach upon the visible staking of the premises, as explicitly provided for in the statute, but not upon generally subsequent and more visible beginnings of an improvement such as clearing, grading, and filling of the premises.[4]

---

**4.** While it may be possible to draw a superficial distinction between staking upon unimproved land and final staking just prior to the actual construction of a building, such was not the legislature's intent. Representative Lindstrom commented as follows on the application of the section 514.05 amendment:

> We had a case, in fact I had a case that went to the Supreme Court where the stakes were about three feet high and the weeds were about three feet, five or six inches. So we had a question as to whether the stakes are visible, whether they're high enough....

*Hearing on S.F. 1483 Before the House Committee on the Judiciary* (March 14, 1974) (statement

by Representative Lindstrom). Such comments can only be reasonably interpreted as referring to staking prior to the clearing or grading of the land.

There is, however, sufficient case authority indicating that preliminary surveying and staking for the purposes of aiding an architect in the drafting of plans does not constitute an actual and visible beginning of an improvement. *See M.E. Kraft Excavating & Grading Co., Inc.,* 279 Minn. 278, 156 N.W.2d 748 (1968); *Lamoreaux v. Andersch,* 128 Minn. 261, 150 N.W. 908 (1915); *cf. Reuben E. Johnson Co. v. Phelps,* 279 Minn. 107, 156 N.W.2d 247 (1968). *See also infra,* note 6. The reason for this exception

In their brief, the mortgagees correctly point out the existence of case law in other jurisdictions to the effect that certain preconstruction work does not constitute the beginning of an improvement or the commencement of a building. *See, e.g., Diversified Mortgage Investors v. Gepada, Inc.*, 401 F.Supp. 682 (S.D.Iowa 1975); *Clark v. General Electric Co.*, 243 Ark. 399, 420 S.W.2d 830 (1967); *Rupp v. Earl H. Cline & Sons, Inc.*, 230 Md. 573, 188 A.2d 146 (1963); *Alladdin Heating Corp. v. Trustees of Central States*, 93 Nev. 257, 563 P.2d 82 (1977).[5] To the extent inconsistent with this decision, such reliance on and analysis of Minnesota law by other jurisdictions is misplaced. As the committee hearings on the 1974 amendments indicate and as the Minnesota decisions on this subject bear out, the law in this state was, and continues to be, that visible preconstruction preparatory work which is fundamental to completing the improvement constitutes section 514.05 actual beginnings of the improvement on the ground.

An early pronouncement by the Minnesota Supreme Court in *Glass v. Freeberg*, 50 Minn. 386, 52 N.W. 900 (1892), is representative of that court's ongoing interpretation of section 514.05 and its predecessor sections. In *Glass*, the court held that where building construction has commenced prior to the recordation of a mortgage, liens subsequent in time to that mortgage will nevertheless be preferred over the mortgage. Justice Mitchell explained in his opinion that:

> The fact that buildings are in process of erection on premises charges every one with notice of the rights of the parties doing the work. If a building is being erected under a contract with the owner, any one dealing with the property is bound to take notice of the fact that labor and material for the completion of the building will be required, and that those who perform or furnish it will, under the law, be entitled to a lien therefor; and if they see fit to take a mortgage under such circumstances they assume the risk of its being subordinated to all liens which may attach to the premises for labor or material for the completion of the building in accordance with the contract under which it is being erected.

*Id.* at 390, 52 N.W. at 901. This concept of notice, which is implicitly embodied in the language of section 514.05, has served as the guiding principle in the court's application of the statute up to the present. *See e.g., Wentworth v. Tubbs*, 53 Minn. 388, 395, 55 N.W. 543, 544 (1893) ("unjust if the land could be afterwards swallowed up by mechanics' liens for work which had not been commenced on the ground, and of which consequently one who might … take a mortgage upon it had no notice or means of knowledge"); *Dolder v. Griffin*, 323 N.W.2d 773, 777 (Minn.1982) (quotes *Glass* in explaining policy established by section 514.05).[6]

---

appears to be to help make financing available for improvements. Despite slightly broader language in one opinion, *see Anderson v. Breezy Point Estates*, 283 Minn. 490, 168 N.W.2d 693 (1969), the case holdings are limited only to very early survey work.

5. In contrast, other courts have held that such preconstruction items of labor as clearing and staking do constitute sufficient beginnings of the improvement for purposes of attachment of all liens if the clearing and staking is reasonably visible. *See Wooldridge Construction Co. v. First National Bank of Arizona*, 130 Ariz. 86, 634 P.2d 13 (Ariz.App.1981); *Frank H. Conner Co. v. Spanish Inns Charlotte, Ltd.*, 294 N.C. 661, 242 S.E.2d 785 (1978); *Reliable Life Insurance Co. v. Brown & Root, Inc.*, 607 S.W.2d 621 (Tex.Civ. App.1980). *See generally* Annot., 1 A.L.R.3d 822 (1965).

6. As an apparent adjunct to the notice concept, a related principle has surfaced in Minnesota decisions which protects the mortgagee with a lien in the improvement when labor or materials furnished prior to the recordation of the mortgage are attributable only to either an unrelated project or a portion of the improvement at a time prior to an intervening abandonment of such improvement. Under this approach, the Minnesota Supreme Court has indicated that, as to the mortgagee's liens, the furnishing of such labor or materials does not constitute the actual and visible beginning of the improvement on the ground. *See e.g., Reuben E. Johnson Co. v. Phelps*, 279 Minn. 107, 156 N.W.2d 247 (1968) (survey done only at request of insurance companies committed to purchase mortgages on the premises and not done for purposes of construction held not an actual and visible beginning of

There is little doubt that the Minnesota Supreme Court contemplated all along in its interpretation of section 514.05 that certain labor extended prior to a building's actual erection may also serve to charge mortgagees with notice of the improvement. Specifically, the decisions indicate that various types of staking on the premises will constitute the requisite actual beginning of the improvement if such staking is sufficiently visible. *Lampert Yards, Inc. v. Thompson-Wetterling Construction & Realty Inc.*, 302 Minn. 83, 223 N.W.2d 418 (1974); *Reuben E. Johnson Co. v. Phelps*, 279 Minn. 107, 156 N.W.2d 247 (1968). The *Phelps* decision, decided prior to the 1974 amendments, involved in part the placement of three or four grade stakes on the premises. Although somewhat unclear from the opinion, the court appeared to base its holding in favor of the mortgagee on the fact that the stakes were concealed by high weeds and not on a determination that such staking could not ever constitute the actual beginning of an improvement.[7] In *Lampert* the court also ruled in favor of the mortgagee. In that case, however, it is clear that the sole basis for the court's holding was that the staking and nailing of batter boards thereto were not sufficiently visible. If the staking was visible in either *Phelps* or *Lampert*, it appears likely that those cases would have been decided differently.

Very recently, the Minnesota Court of Appeals interpreted section 514.05 in a manner reasonably consistent with this decision. *See Jesco, Inc. v. Home Life Insurance Co.*, 357 N.W.2d 123 (Minn.Ct.App. 1984) (currently available in the Nov. 2, 1984 edition of Finance and Commerce). In *Jesco* the court held that the trial court

the improvement); *New Prague Lumber & Readi-Mix Co. v. Bastyr*, 263 Minn. 249, 117 N.W.2d 7 (1962) (where second project was merely an afterthought and followed completion of first project by five months, intervening mortgage held superior to the second improvement); *National Lumber Co. v. Farmer & Son, Inc.*, 251 Minn. 100, 87 N.W.2d 32 (1957) (where fence erected on premises to protect tree from machinery involved either in concurrent grading of adjacent street or in later excavating of subject dwelling, trial court held to have necessarily concluded that erection of the fence was severable and separate from excavation and construction of the dwelling); *Brettschneider v. Wellman*, 230 Minn. 225, 41 N.W.2d 255 (1950) (although no abandonment found, court implicitly indicates that abandonment would prevent work from being continuous as required by case law); *Carr-Cullen Co. v. Deming*, 176 Minn. 1, 222 N.W. 507 (1928) (destruction and removal of building held not to be sufficiently contractually linked to subsequent excavation for new building to constitute actual and visible improvement).

Language in *National Lumber Co., supra,* provides that "the line of distinction is whether or not the improvement bears directly on the construction of the building rather than whether it is a part of the overall project involved." 251 Minn. at 104, 87 N.W.2d at 36. Adopting the interpretation of other jurisdictions, the construction mortgagees argue that the court intended to exclude as the requisite beginnings of the improvement all off-site work and preliminary on-site work. As I have already indicated, the legislative history makes it clear that, at least as of the 1974 amendments, on-site prepar-

atory work such as staking and grading, which serves as a prelude to actual construction, should suffice to constitute such a beginning of the improvement. Moreover, the case law supports this interpretation. *See* text, *infra.* As a result of my decision in this case, it is unnecessary to decide whether off-site work should be similarly treated.

It is also clear that there was never any abandonment of the relevant improvements. Although construction delays did occur, they were with few exceptions generally seasonal in nature. In all cases, completion of the improvements was fully anticipated. The projects were continuous and inseparable. *See Brettschneider*, 230 Minn. at 231–33, 41 N.W.2d at 159–60.

7. The confusion concerning the court's holding arises from the fact that the case also involved the placement of survey stakes on the premises in connection with a survey which was made to mark the perimeters of the lot at the request of two insurance companies which were committed to later purchase the mortgage on the premises. As this survey was unrelated to the actual construction of the improvement, the court held that the legislature could not have intended it to constitute the beginning of the improvement. Significantly, the court's subsequent discussion of the grade stakes specifically focuses only on the fact that such stakes were not visible. *See Lampert Yards, Inc. v. Thompson-Wetterling Construction & Realty, Inc.*, 302 Minn. 83, 87, 223 N.W.2d 418, 421 (1974) ("In Phelps, we held that the presence of a few grade or fill stakes *not readily visible* to observers ... did not constitute such actual and visible notice as required by § 514.05.") (emphasis added).

erred in finding that survey stakes were not reasonably visible to the mortgagee. The court indicated that, as a result of the 1974 amendment to the statute, the effect of its ruling was to give priority to all mechanic's liens. While I do not adopt in total the court's interpretation of the legislative history to the amendment,[8] its interpretation of post-amendment law is identical to that herein. Recent trial court decisions in this state similarly support this interpretation of current law. *See Barbarossa and Sons, Inc. v. Larkspur Development, Inc.*, No. 81–04226 (Scott Cty., Minn. March 1, 1982); *Duininck Bros. & Gilchrist v. Brandondale Chaska Corp.*, No. 14327 (Carver Cty., Minn. June 4, 1975).[9]

In the present case, the facts indicate a degree of labor expended in excess of that preliminary survey work necessary for acquiring financing. *See M.E. Kraft Excavating & Grading Co. v. Barac Construction Co.*, 279 Minn. 278, 156 N.W.2d 748 (1968). On all four sites substantial labor was devoted to preparation for actual construction. Such site preparation was at the very least visibly evidenced by survey and grade stakes, clearing, grubbing, and rough grading. Moreover, this labor was clearly fundamental to completion of the overall improvements.

■ I am of the opinion that as to all four mortgages there was an actual and visible beginning of the improvement on the ground that preceded the recording of such mortgages. The plain reading of section 514.05, as further illuminated by the legislative history of the 1974 amendments and existing Minnesota case law, supports

a determination that the staking, clearing, grubbing, and grading of the building sites reasonably placed the mortgagees on notice that something was in the process of being constructed. They may not have been specifically aware of the degree of construction to be performed on each site. However, they could not reasonably deny that the condition of the ground informed them that labor and materials for the completion of an improvement thereon would be required. In taking the mortgages when they did, the mortgagees assumed the risk of such mortgages being subordinated to all mechanic's liens. *Glass v. Freeberg*, 50 Minn. at 390, 52 N.W. at 901. This decision is consistent with the policy in this state of construing lien laws liberally in favor of mechanic's lien claimants. *Anderson v. Breezy Point Estates*, 283 Minn. 490, 168 N.W.2d 693 (1969); *Johnson v. Starrett*, 127 Minn. 138, 149 N.W. 6 (1914).

### B. *Priority of Mechanics Lienholders*

There are two items which govern the validity, priority and extent of the various mechanics' lien claims in this case—(1) Minn.Stat. § 514.01 *et seq.*, and (2) the Court's standing order of December 29, 1983, as amended May 9, 1984.

■ Minn.Stat. § 514.01 *et seq.* requires certain procedures be followed in order to perfect a valid mechanics' lien against property. These procedures include giving notice to the owner of the work being done or material furnished within 45 days after the first work or materials are furnished (Minn.Stat. § 514.011),[10] filing a proper statement of claim with the County Record-

---

**8.** Citing *Anderson v. Breezy Point Estates*, 283 Minn. 490, 168 N.W.2d 693 (1969), the *Jesco* court states that prior to the amendment survey work could not constitute the beginning of an improvement and could not operate to attach or give notice of mechanic's liens. The House Judiciary Committee record, however, indicates otherwise. The most reasonable interpretation of Minnesota case law, in light of the legislative history behind the amendment, is that the amendment did not alter the existing law on this subject. Aside from a slender exception carved out by decisions referred to in the *Anderson* opinion, *see supra* note 4, the law has been and remains that staking does constitute a be-

ginning of an improvement for purposes of attachment.

**9.** In *Duininck,* the defendant elected not to appear and the matter was tried by default. The district court made findings of fact and conclusions of law based solely on the evidence submitted by the plaintiff.

**10.** This does not apply to multiple dwellings of 4 units or more so it does not apply to the condominium units in this case. M.S.A. § 514.011 Subd. 4b.

er and serving a copy of the statement on the owner within 120 days after the last work of the lien claimants (Minn.Stat. § 514.08), filing a lis pendens notice and commencing an action against the appropriate parties within one year after the last item of the lienholder's work or material was furnished (Minn.Stat. § 514.12). If these procedures are followed, as noted in the discussion above, a mechanics lien claimant has a valid, perfected lien against the affected real property. The lien, for priority purposes, attaches, regardless of when the work was actually done, as of the first date the first "actual and visible beginning of the improvement on the ground commenced." Minn.Stat. § 514.05. At least certain of these acts of perfecting one's lien could be done even after the debtor had filed its bankruptcy petition (filing mechanics lien statement). *Victoria Grain Co. of Minneapolis v. Janesville Elevator Construction, Inc.,* (In re Victoria Grain Co. of Minneapolis), unreported decision of March 20, 1984, Bky.File No. 4–83–2081, ADV 4–84–7.

The Court issued a standing order dated December 29, 1983, in this case, which was amended May 9, 1984, relating to mechanics lien claims against the Debtor's various properties. The Orders do *not* establish the validity, priority or extent of any liens. The December 29, 1983, Order established a procedure to allow smooth sales of Debtor's various real estate properties free and clear of liens without hearings on each specific sale.[11] Basically, all sales proceeds were paid out pursuant to the Title Examiner's report subject to return if the lien was later avoided or priorities determined to be other than as set forth in the Examiner's Report.

The May 9, 1984, amendment to the Standing Order established a procedure for claimants to file claims and a bar date after which no more claims against Debtor's real property could be filed. All claimants were required to file a bill of particulars with the title examiner by May 18, 1984. Again the amendment does not establish the validity, priority or extent of any lien claim. It merely extinguished any right to claim sales proceeds monies under the procedure established by the Court if no documentation or inadequate documentation was provided by May 18, 1984.

There are five types of lien claimants involved in this case:

1. Lien claimants who filed both mechanics lien statements and bills of particulars.

2. Lien claimants who filed only mechanics lien statements.

3. Lien claimants who filed only bills of particular.

4. Lien claimants who filed no mechanics lien statements or bill of particulars.

5. Lien claimants who filed defective mechanics lien statements and/or bills of particulars.

Based upon the Minnesota mechanics lien law, the Court's standing order and this decision, I find that only lien claimants who filed a valid, timely mechanics lien statement and a bill of particulars or who filed only a valid timely mechanics lien statement have valid perfected liens superior to that of the mortgagee in each of the cases involved herein.

Under Minn.Stat. § 514.01 *et seq.,* the only manner in which to establish a valid mechanics lien claim is to follow the appropriate procedures. Once followed, a valid lien attaches. The Court's standing order did not give special priority to lien claimants who filed bills of particular, or allow them to perfect their claim without following the mechanics lien law. It merely established a system to find and give notice to lien claimants, to allow sales with the interest of lien claimants, whatever they may be, to attach to the sales proceeds, and to establish a final bar date to filing any lien claim so that distribution of sales proceeds could occur. This Court will not

---

11. Debtor had 50+ partially completed residential units—single family, twin home and condominium units at the time of its bankruptcy filing. To have hearings on each one would have been burdensome to the debtor, counsel for the various committees and the Court.

rewrite or expand the mechanics lien law of Minnesota, with which all lien claimants should be familiar.

All lien claimants, however, who filed bills of particular which are correct shall have a valid claim against the sales proceeds of the particular property described in the bill of particulars of a claimant. The priority of that lien is not being determined at this time except that, pursuant to this decision, it is not a perfected lien under Minn.Stat. § 514.01 *et seq.* and therefore is not entitled to priority over perfected mechanics lien claims or perfected mortgages.

Those lien claims for which *no* mechanics lien statement was filed and *no* bill of particulars was filed are not perfected liens and therefore have no priority over the mortgagee's mortgage or over perfected lien claims. In fact, pursuant to the Court's standing order of May 9, 1984, these claims are barred from attaching in any manner to the sales proceeds of particular properties. This is also true as to defective mechanics lien statements and bills of particular which are not substantially in compliance with the form requested.

### C. *Validity of particular lien claimants' liens*

1. All lien claims found to be based on valid perfected mechanics lien statements are valid unless specifically rejected for other reasons below. All lien claims which, although not based on filed mechanics lien statements, are based upon properly filed bills of particular per the Court's standing order are also valid (although unperfected) claims against the sales proceeds of the property filed against unless specifically rejected for reasons stated below.

All other lien claims I find to be ineffective, invalid claims as against the sales proceeds of Debtor's particular properties.

2. In the Woodcliff Fourth Addition test case, the evidence showed Genz-Ryan Plumbing & Heating Co. furnished invoices to the Title Examiner establishing its claim, although the invoices were not attached to the required bill of particulars form. I find

that Genz-Ryan has substantially complied with the standing order of the Court and therefore has a valid but unperfected claim against the property's sale proceeds.

■ 3. Two issues were raised in this case as to the extent of Lyman Lumber's liens as to the Lake Eden East properties, the Cinnamon Ridge properties, and the Woodcliff Fourth Addition properties. As the facts show, Lyman Lumber usually provided lumber to Debtor at a price approximately 15% below normal retail price for the lumber. If not timely paid, Lyman Lumber (Lyman) filed a lien for the retail price of the product and service charges. The issues are what amount is the proper one for Lyman's lien in each test case, and, if incorrectly filed, should Lyman's entire lien be voided in each test case.

Minn.Stat. § 514.03 provides:

Subdivision 1. With respect to any contract or improvement as to which notice is not required by section 514.011, the lien shall be as follows:

(a) If the contribution is made under a contract with the owner and for an agreed price, the lien as against him shall be for the sum agreed upon.

(b) In all other cases, it shall be for the reasonable value of the work done, and of the skill, material, and machinery furnished.

Subd. 2. With respect to any contract or improvement as to which notice is required by section 514.011, the lien shall be as follows:

(a) If the contribution is made under a contract with the owner and for an agreed price, the lien as against him shall be for the sum agreed upon.

(b) In all other cases, it shall be for the reasonable value of the work done, and of the skill, material, and machinery furnished. . . .

In this case, I find that Lyman and the Debtor did have a contract re the prices to be paid per unit, which was not retail price. Although specific bid sheets for specific units were not offered in evidence for each unit, I find that the parties' course of deal-

ing evidences an arrangement was in force establishing the price of Lyman's product to Debtor at 15% below retail price. Under Minn.Stat. § 514.03, the value of Lyman's lien should therefore be the retail price less 15%. The evidence in this case would tend to show that the retail price less 15% would also be a "reasonable value" of the materials as provided under the other subdivision of Minn.Stat. § 514.03.

In the Lake Eden East project, Lyman provided sheetrock in addition to its normal bid package to the Debtor. There was considerable disagreement as to the value of the sheetrock provided. Since this was not provided under the parties' normal contract arrangement, Lyman could charge, under Minn.Stat. § 514.03, the "reasonable value" of the material. Lyman says the value of the sheetrock was approximately $29,000. Debtor says the value was approximately $9,600. Lyman had invoices to substantiate its claim but the testimony re what was actually furnished and how the claim became $68,000 was not clear. Debtor had no documentation, but Debtor's president testified that the range of price for the sheetrock in the building at Lake Eden East should have been about $9,600. Since the evidence is unclear, I find that Lyman has not substantiated its burden of proof as to value and I find that the sheetrock and other extras are valued at the $9,600 value and therefore allow Lyman's claim as to the Lake Eden East property as a valid, perfected claim in the amount of the retail price of materials furnished to the project less 15% plus $9,600 for sheetrock materials.

■ Minn.Stat. § 514.74 provides that a lien claim may be avoided if an incorrect claim is filed at least in certain instances. *Delyea v. Turner*, 264 Minn. 169, 118 N.W.2d 436 (1962); *Engler Brothers Construction Company v. L'Allier*, 280 Minn. 208, 159 N.W.2d 183 (1968); *Ternes v. Westberg*, 246 Minn. 485, 75 N.W.2d 415 (1956). The cases have required a showing of an intentional demand for an excess amount, fraud or bad faith. In this case, I do not find the evidence sustains a finding

of actual intent to file incorrectly, fraud or bad faith on the part of Lyman. I find that Lyman had legitimate questions as to which section of Minn.Stat. § 514.03 applied to it, and acted accordingly filing for the higher sum. If Lyman had filed for the lesser sum, the right to claim the retail value would have been lost.

■ 4. The issue of whether Lyman Lumber's lien, if Lyman had actual notice of the construction mortgage prior to furnishing materials to a housing unit, is subordinate to that of the construction lender has been raised. The applicable statute is Minn.Stat. § 514.05 which states:

> All such liens, as against the owner of the land, shall attach and take effect from the time the first item of material or labor is furnished upon the premises for the beginning of the improvement, and shall be preferred to any mortgage or other encumbrance not then of record, unless the lienholder had actual notice thereof. As against a bona fide purchaser, mortgagee, or encumbrancer without notice, no lien shall attach prior to the actual and visible beginning of the improvement on the ground, ...

There are no cases directly in point in Minnesota. The cases cited by counsel and the other cases reviewed by the Court are not directly in point. *Anderson v. Iverson Outdoor Light*, 187 Minn. 308, 245 N.W. 365 (1932); *Carl H. Peterson Co. v. Zero Estates*, 261 N.W.2d 346 (Minn.1977); *Glass v. Freeburg, supra*. All of them deal with situations where the lien claimant's work was done prior to the mortgage being filed. In this case, Lyman's material was furnished *after* the mortgages were recorded.

In some cases in other states, a lien claimant who furnished materials to a project after notice of a mortgage lender's mortgage was denied priority over the mortgage. E.g., *American-First Title & Trust Co. v. Ewing*, 403 P.2d 488 (Okla. 1965) (lien of lien claimant who furnished materials to a building under a separate contract after the construction mortgage was in place held subordinated to mortgag-

ee even though other lienholders' improvements commenced prior to mortgage); *Union Terminal Co. v. Turner Const. Co.,* 247 F. 727, 11 A.L.R. 880 (5th Cir.1918) (construing Florida law, Court held that lien claimant who had knowledge that money to pay lien claimants was to be advanced by a lender did not have a lien superior to the lender's unrecorded mortgage.)

The Minnesota statute says "*all* such liens shall attach and take effect from the time the first item of material or labor is furnished upon the premises at the beginning of the improvement ..." (Emphasis added). This states, it seems to me, that only matters of which one has notice at the furnishing of the first improvement are relevant. If knowledge of a later mortgage subordinated all lien claimants who performed work after the mortgage who knew of the mortgage, it would eviscerate much of the mechanics lien law. Many projects have a mortgage placed at least at some point during construction and all work on a project would halt if lien claimants had to negotiate payment and/or lien priority with the lender at that time. I do not think this is what the legislature intended.

In any event, I do not think the facts showed that Lyman Lumber had actual knowledge of the mortgage. Ms. Case of Zachman Homes stated that she mailed reports to Lyman which would have shown the mortgage. Mr. Allar of Lyman Lumber stated that Lyman Lumber didn't receive the reports. With these disputed facts, I do not think actual notice was shown.

■ 5. The last issue raised is whether the Title Examiner should prorate the blanket lien of lien claimants among the various condominiums, single family dwellings, or town homes when more than one individual residential unit is covered by a lien claim.

As to Lake Eden East, which is a condominium project, proration of blanket liens of Lyman, Midwest Paving & Recycling Co., Inc., Meister-Plasha Excavation Co., Westwood Planning & Engineering Co., Egan, Field & Nowak, Inc., and Sunrise

Electric is proper under Minn.Stat. § 515A.4–109(b). The liens of Westwood, Egan & Sunrise do not contain defective legal descriptions. They clearly cover Lot 4, Block 1, among other parcels.

As to the other three developments—Cinnamon Ridge Third, Woodcliff Fourth, and Fox Glen Third Addition, no such statute applies. These projects were either twin homes or single family dwellings. Therefore, a blanket lien as to property which the lien claimant improved cannot be prorated except by agreement of the parties. See Minn.Stat. §§ 514.03 and 514.09. *Carpenter v. Wilverscheid,* 5 Minn. 170, Gil. 133 (1861); *Carpenter v. Leonard,* 5 Minn. 155, Gil. 119; *Menzel v. Tubbs,* 51 Minn. 364, 53 N.W. 653 (1892); *Lax v. Peterson,* 42 Minn. 214, 44 N.W. 3 (1861); *LaValle v. Bayless,* 257 N.W.2d 283 (1977). As to the Cinnamon Ridge Third Addition, no proration agreement was in force as to Lyman Lumber, who holds a valid lien. As to the Fox Glen Third Addition, Elk River Readi-Mix, Donald McCarty, Subterranean Engineering, Midwest Planning & Engineering, and Federal Lumber all had their liens prorated with no evidence of a proration agreement. As to Woodcliff Fourth, the liens of Westwood Planning & Engineering, and Egan, Field & Nowak were prorated without evidence of a proration agreement. Lyman Lumber had agreed to prorate its lien on a unit basis.

D. *Reservation of Issues*

The Court is specifically not ruling on certain issues in this opinion and is reserving these issues until raised.

1. Attorneys fees allowable to Lyman Lumber Co.'s counsel, for its work in the hearings on these matters.

2. The claim of the estate of the debtor as to the validity, priority or enforceability of any claim under 11 U.S.C. § 544.

3. The amounts which should be paid to particular lien claimants or amounts which should be repaid to the estate by any mortgagee or lien claimant.

## CONCLUSIONS OF LAW

1. The first "actual and visible beginning of the improvement on the ground" as to Building F, Lake Eden East, Carriage Homes, Condominium No. 383, Lot 4, Block 1, Lake Eden East, Hennepin County, Minnesota, was July 12, 1982, when all lot corners of the lot were staked and the building pad was staked, and general grading had commenced.

2. The first "actual and visible beginning of the improvement upon the ground" as to Lot 5, Block 3, Cinnamon Ridge Third Addition was September 30, 1982 at which time the clearing, grubbing, cutting, filling and grading of the Cinnamon Ridge Third Addition was done and staking was done.

3. The first "actual and visible beginning of the improvement upon the ground" as to Lot 1, Block 1, Fox Glen Third Addition was October 26, 1982, at which time lot corners were staked and rough grading had commenced.

4. The first "actual and visible beginning of the improvement" on the ground was to Lot 2, Block 1, Woodcliff Fourth Addition July 31, 1982 or by which point rough grading of the Woodcliff Second Addition had been done and the house pad was graded on Lot 2, Block 1, Woodcliff Fourth Addition.

5. All mechanics lien claimants who filed mechanics lien statements according to Minn.Stat. § 514.01 *et seq.* hold valid mechanics lien claims against the particular property filed against as of the date of the first actual and visible beginning of the improvement on the ground on that lot.

6. All mechanics lien claimants who filed bills of particular pursuant to the Court's Standing Order of December 29, 1983, as amended May 9, 1984, hold valid but unsecured and unperfected claims against the real property.

7. Lyman Lumber Company is awarded the contract price for its materials furnished to debtor which contract price is the retail price less 15% except as to those extra items furnished by Lyman Lumber Company to debtor's property which may be liened at retail price.

8. Lyman Lumber Company did not file mechanics lien statements with any fraudulent intent or bad faith.

9. Lyman Lumber Company did not have actual notice of the mortgage lender's lien prior to Lyman Lumber Company's furnishing of materials to any project.

10. All blanket mechanics liens filed by mechanics lien claimants against Building F, Lake Eden East shall be prorated according to the number of condominium units against which the mechanics lien statement is filed.

11. All mechanics lien claims filed by mechanics lien claimants against properties in Cinnamon Ridge Third, Woodcliff Fourth and Fox Glen Third Additions shall not be prorated unless agreed to be separate agreement.

IT IS THEREFORE ORDERED:

1. The following lien claims of mechanics lien claimants are valid, perfected lien claims:

1. Westwood Planning & Engineering Co—(to be determined by proration of lien over all units on Lots covered in legal description)

2. Egan, Field & Nowak, Inc.—(to be determined by proration of lien over all units on Lots covered in legal description)

3. Fred W. Pagenkopf—$100 per unit

4. Midwest Paving & Recycling Co., Inc.—$1,065.50 per unit (against Unit No. 42 only)

5. Ray N. Welter Heating Co.—(to be determined by proration of lien over all units on Lots covered in legal description)

6. Meister Plasha Excavation—$53.44 per unit

7. Rocket Crane Service—$269.50 (against Unit No. 46 only)

8. Sunrise Electric—(to be determined by proration of lien over all units on Lots covered in legal description)

9. Lyman Lumber Company—(to be determined from retail price less 15% for

materials furnished under normal package plus $1,200 per unit for sheetrock) as against the following described property (or designated part thereof):

Building F, Units No. 42, 44, 46, 47, 48, Lake Eden East Carriage Homes, Condominium No. 383, Lot 4, Block 1, Lake Eden East, according to the recorded plat thereof.

2. The following lien claims of mechanics lien claimants are valid, perfected lien claims:

1. F.C. Hayee Co.—$1,203.36
2. J & W. Asphalt Construction, Inc.—$9,554.55
3. Genz-Ryan Plumbing & Heating Co.—$525.00
4. Robert Doheny Construction—$610.00
5. Automatic Garage Door Company—$3,130.00
6. Meister-Plasha Excavation—$726.00
7. Stewart Interiors, Inc.—$1,322.64
8. Selby Ornamental Iron Company—$158.00
9. Lyman Lumber Company—retail price of materials less 15%
10. Orv Bakke Insulation Co.—$1,082.00

as against the following described property (or designated part thereof):

That part of Lot 5, Block 3, Cinnamon Ridge Third Addition lying Northeasterly of a lien drawn from a point on the Southeasterly line of said Lot 5, Distant 40.00 feet Southwesterly of the most Easterly corner thereof to a point on the Northwesterly line of said Lot 5, Distant 40.00 feet Southwesterly of the most Northerly corner thereof.

3. The following lien claims of mechanics lien claimants are valid, perfected lien claims:

1. Elk River Ready Mix—$1,300.00
2. Donald L. McCarty—$1,400.00
3. Federal Lumber Company—$24,562.98
4. Midwest Paving & Recycling Co.—$42,786.53

5. Westwood Planning & Engineering Co.—$4,196.97
6. Meister-Plasha Excavation—$2,787.00
7. Rocket Crane Service—$196.00
8. Ray N. Welter Heating & Plumbing—$2,185.00 per unit
9. David C. Edgett—$300.00 per unit

as against the property (or designated part thereof) described as Lot 1, Block 1, Fox Glen Third Addition, Hennepin County, Minnesota.

4. The following lien claims are valid, perfected lien claims:

1. DLR Construction—$40,193.85
2. Egan, Field & Nowak, Inc.—$4,348.63
3. Westwood Planning & Engineering—$4,139.61
4. Rocket Crane Service, Inc.—$367.50
5. Ray N. Welter Heating Co.—$2,065.00
6. Lyman Lumber Co.—$14,357.58

as against the property (or designated part thereof) described as Lot 2, Block 1, Woodcliff Fourth Addition.