REUBEN E. JOHNSON COMPANY v. LYMAN L. PHELPS
AND OTHERS.
HARTFORD LIFE INSURANCE COMPANY
AND ANOTHER, RESPONDENTS.

156 N. W. (2d) 247.

January 12, 1968—No. 40,426.

*B. C. Hart, Jonathan H. Morgan, Samuel L. Hanson,* and *Briggs & Morgan,* for appellants.

*Charles L. Horn, Jr., Stephen E. Lee,* and *Faegre & Benson,* for respondents.

*Kueppers, Strong & Kueppers* and *Fred A. Kueppers,* amicus curiae.

KNUTSON, CHIEF JUSTICE.

This is an appeal from an order of the district court denying a motion to amend findings of fact, conclusions of law, and order for judgment or, in the alternative, for a new trial in an action involving foreclosure of several mechanics liens. The case involves essentially a dispute between the holder of a mortgage on the property and the mechanics lien claimants.

The facts are not seriously in dispute. Lyman L. Phelps and his wife and Alexander M. Barac became the owners of some property in Golden Valley on which they proposed to erect an apartment complex. They sought financing through various mortgage brokers, which was finally arranged through the Schumacher Mortgage Company, Inc., hereinafter called Schumacher.

The financing arrangements were somewhat complicated in that Schumacher did not wish to enter into long-term commitments. The Monarch Life Insurance Company and the Hartford Life Insurance Company (hereinafter called Monarch and Hartford) agreed to long-term loan commitments upon completion of the building. However, neither wanted to have a mortgage for the whole amount subordinate to the other, so the property was divided into two lots, and Monarch agreed to purchase a mortgage for $400,000 on one lot when rentals had reached $68,442.[1] Hartford agreed to purchase a mortgage of $350,000 on the other when

---

[1] The commitment was later modified by removing the rent requirement.

rentals reached $58,845.84.[2] These commitments ran to Schumacher but were accepted by Schumacher, Phelps, and Barac. The instruments were not themselves mortgages but simply commitments to buy the mortgages when the buildings had been completed.

Armed with these assurances that it would not be burdened with long-term commitments Schumacher made available the funds necessary to build the complex. On October 18, 1962, it agreed with Phelps and Barac to make a construction loan. The agreement contained the following provision (paragraph 2):

"Schumacher agrees to advance to Builder and Partnership for use in the work of such construction and improvements on Property an amount not to exceed $280,000.00, to be advanced as hereinafter provided from the proceeds of that certain Mortgage of even date herewith executed by Partnership to Schumacher covering property in the principal amount of $350,000.00."[3]

Paragraph 3 of this agreement provides in part:

"Said construction loan funds shall be used by Builder and Partnership only for the purpose of such work of construction, land purchase advance and improvements on Property."

Another loan agreement executed on the same day contained provisions identical to the one quoted, except that it provides for advances of $320,000 "from the proceeds of that certain Mortgage of even date herewith executed by Partnership to Schumacher covering property in the principal amount of $400,000.00."

Actually, the mortgages "of even date" were executed October 30, 1962. They were recorded on the same day. During the next 16 months Schumacher actually advanced $750,000, the face amount of the two mortgages less holdbacks for interest and fees. On October 22, 1963, the mortgages were assigned, according to the commitments theretofore made, to Hartford and Monarch.

---

[2] This commitment was also later modified.

[3] "Builder" refers to Barac Construction Company, Inc., and "Partnership" refers to the partnership of Barac and Phelps.

On the day the mortgages were filed, two officers of Schumacher went to the building site to determine whether any work had been commenced thereon. They testified that the land was overgrown with tall grass, weeds, and shrubs, and that as they walked about the property they saw no stakes and no indication of construction or grading. Photographs which they took reveal no indication of construction or grading stakes.

Willis W. Snyder, the excavating contractor for the project, testified that he did see stakes on the site prior to the date the mortgages were recorded. About a week before November 1, 1962, he inspected the site on a tour with the builder. On this tour he saw both surveyor stakes and grade, or "cut and fill," stakes. Snyder admits there was tall grass, 2½ feet or so, all over the site and that he would not have seen the stakes if they had not been pointed out to him.

As a result of the construction of this building numerous mechanics liens were filed. The first was filed by the Reuben E. Johnson Company on October 18, 1963. The validity of the liens against the owners is not in dispute. The Johnson company instituted the present proceedings in the district court to foreclose its mechanics lien. The trial court found that the mortgages of Hartford and Monarch were recorded before any material or labor was furnished and before the actual and visible beginning of the building improvement, and concluded that the mortgages had priority over the liens for all amounts remaining unpaid thereon. Nine claimants moved the court for amended findings of fact, conclusions of law, and order for judgment or, in the alternative, for a new trial. There were 19 claimants in all and all have appealed from the order of the court.

The questions presented here are: (1) May those claimants who did not join in the motion for amended findings or a new trial appeal from the order denying it? (2) Was Schumacher required to make advances of $750,000, or was its obligation limited to advancing only $600,000? (3) Did Schumacher record the mortgages with notice that a mechanics lien had attached? (4) Did the trial court err in finding that no actual and visible beginning of the improvement had been made at the time the mortgages were recorded?

■ Mechanics liens are purely creatures of statutes. Minn. St. 514.01, so far as material here, reads:

"Whoever contributes to the improvement of real estate by performing labor, or furnishing skill, material or machinery for any of the purposes hereinafter stated, whether under contract with the owner of such real estate or at the instance of any agent, trustee, contractor or subcontractor of such owner, shall have a lien upon the improvement, and upon the land on which it is situated or to which it may be removed, for the price or value of such contribution; * * *."

Section 514.05 sets forth the conditions under which a lien comes into being and attaches. It reads:

"All such liens, as against the owner of the land, shall attach and take effect from the time the first item of material or labor is furnished upon the premises for the beginning of the improvement, and shall be preferred to any mortgage or other encumbrance not then of record, unless the lienholder had actual notice thereof. As against a bona fide purchaser, mortgagee, or encumbrancer without notice, *no lien shall attach prior to the actual and visible beginning of the improvement on the ground,* but a person having a contract for the furnishing of labor, skill, material, or machinery for such improvement, may file for record with the register of deeds of the county within which the premises are situated, or, if claimed under section 514.04, with the secretary of state, a brief statement of the nature of such contract, which statement shall be notice of his lien for the contract price or value of all contributions to such improvement thereafter made by him or at his instance." (Italics supplied.)

It must be assumed that the legislature chose the precise language of this statutory provision with care, intending to protect a mortgagee who advances its money for the improvement of the premises as against lien claimants who file their claims after the mortgage is recorded. The "actual and visible beginning of the improvement on the ground" has a definite meaning. In order to have priority over a mortgage duly recorded, the material or labor furnished for the improvement must represent an actual beginning of the improvement *on the ground* and it must be

visible; that is, a person using reasonable diligence in examining the premises must be able to see it.

■ Thus, as to a bona fide mortgagee without notice, the question is whether there was an actual and visible beginning of the improvement *on the ground* prior to the recording of his mortgage. Inferentially, if the mortgagee has notice of the furnishing of material or labor upon premises for the beginning of the improvement, he stands in the same position as an owner. Appellants contend that Schumacher had actual notice of the grade and fill stakes. A fair examination of the record does not sustain this contention.

It is conceded by everyone that a mortgage executed and recorded before a lien attaches which obligates the mortgagee to make future advances for improvement of the premises has priority over liens subsequently filed. In Erickson v. Ireland, 134 Minn. 156, 158, 158 N. W. 918, 919, we said:

"It is well settled in this state that a mortgage given to secure future advances, which advances are in fact later made, has priority over mechanics' liens attaching after the mortgage is given, but before the advances are made, where the making of the advances was obligatory upon the mortgagee under the terms of this contract with the mortgagor."

Conversely, it may be that payments optionally advanced after a lien has attached are inferior to that lien. See, Finlayson v. Crooks, 47 Minn. 74, 49 N. W. 398, 645.[4]

■ As against an owner, one who performs services may have a lien which would not be effective to permit subsequent liens to attach as against a good-faith mortgagee. Thus, in Lamoreaux v. Andersch, 128 Minn. 261, 150 N. W. 908, L. R. A. 1915D, 204, we held that an architect had a lien against the owner of premises for services rendered in preparing plans for a building, even though the building was never constructed. But in Erickson v. Ireland, *supra,* we held that the services of an architect in preparing plans for a building were not such a lienable item as to permit liens subsequent to a mortgage to attach as against

---

[4] But see, Landers-Morrison-Christenson Co. v. Ambassador Holding Co. 171 Minn. 445, 448, 214 N. W. 503, 505, 53 A. L. R. 573.

the mortgagee, even though the building was constructed. We there said (134 Minn. 161, 158 N. W. 920):

"We hold that when a building is erected all liens attach at the time the first item of material or labor is furnished on the ground. The result is that the mortgage is prior to the liens."

It follows that Erickson v. Ireland is authority for the proposition that, while an architect may have a lien for his services against the owner, liens filed subsequent to a mortgage such as we have here do not attach from the time the architect commences his work, because the architect's work is not an "actual and visible beginning of the improvement on the ground."

■ In order to divide the property so that first mortgages could be placed on two separate parts thereof, it was necessary to make a survey to mark the perimeters of the two lots. Appellants now claim that this survey constituted such notice to the mortgagee of the beginning of the improvement so that any liens subsequently filed would attach as of the date of the survey.

In the case of Lamoreaux v. Andersch, *supra,* a survey of the land was made and furnished to the architect for use in preparing plans. An old barn was also removed from the premises. With respect thereto we said (128 Minn. 263, 150 N. W. 909):

"* * * The removal of the old barn by defendants and the making of the survey cannot be considered as an improvement. This was done entirely independently of the contract with plaintiffs, and clearly plaintiffs contributed nothing to this work."

Here, too, the original survey was not an improvement. It was made only to mark the perimeters of the lots for division at the request of the two insurance companies which were committed to purchase the mortgages on the premises when the improvement was completed. It would not be a lienable item so as to permit liens to attach from the date of the survey.

If a preliminary survey of this kind were to be held an actual and visible beginning of the improvement on the ground so that all liens filed thereafter would have priority over a mortgage given to secure ad-

vances for completion of the improvement, it is safe to say that it would be difficult, if not impossible, to procure financing for any such improvement. We do not believe the legislature could have intended such a result.[5]

■ In addition to the survey stakes marking the perimeters of the lots, three or four grade stakes were apparently placed on the premises, but the testimony of Schumacher's executive was that they were not visible. It is conceded that the property was covered with weeds and brush about 2 feet high. Even appellants' witness Snyder testified that, while he found these grade stakes, he would not have seen them had they not been pointed out to him. Under these circumstances it must be held that they did not constitute an "actual and visible beginning of the improvement on the ground" so as to charge the mortgagee with notice of the commencement of the improvement.

With respect to both architectural services and surveys, we think the following statement of Mr. Justice Mitchell, writing for the court in the case of Wentworth v. Tubbs, 53 Minn. 388, 395, 55 N. W. 543, 544, is appropriate:

"* * * [I]t would be very unjust if the land could be afterwards swallowed up by mechanics' liens for work which had not been commenced on the ground, and of which consequently one who might buy the property or take a mortgage upon it had no notice or means of knowledge when he took his deed or his mortgage."

■ Appellants apparently contend that Schumacher had actual knowledge of the architect's work performed and the surveys made and should therefore be chargeable with notice, even though there was no actual and visible beginning of an improvement on the premises. This contention was rejected in Landers-Morrison-Christenson Co. v. Ambassador Holding Co. 171 Minn. 445, 448, 214 N. W. 503, 504, 53 A. L. R. 573, 576, where we said:

"All liens attach from the time the first item of material or labor is furnished on the premises for the beginning of the improvement. As against the owner a lien may attach although no material or labor has

---

[5] See, Daugherty v. Gunther, 88 Wash. 378, 153 P. 336.

been furnished on the ground. Lamoreaux v. Andersch, 128 Minn. 261, 150 N. W. 908, L. R. A. 1915D, 204.

" 'As against a bona fide purchaser, mortgagee or incumbrancer without notice, however, *no lien shall attach prior to the actual and visible beginning of the improvement on the ground.*'

"Appellants contend that the words 'without notice' in this provision of the statute mean without notice of a contemplated improvement; and that where a mortgagee takes his mortgage with knowledge that the construction of an improvement on the property is contemplated, the mortgage is subject to any liens that may thereafter accrue by reason of the construction of such contemplated improvement. They concede that the case of Erickson v. Ireland, 134 Minn. 156, 158 N. W. 918, decided this point contrary to their contention, but insist that the rule as announced in that case is erroneous. We cannot sustain appellants' contention. To give the words such a meaning would not accord with the purpose of the statute to fix the relative rights and priorities of purchasers, incumbrancers and lienholders with definiteness and certainty. We think that the words 'without notice' as there used mean without notice of an existing lien." (Italics supplied.)

Again, in Carr-Cullen v. Deming, 176 Minn. 1, 4, 222 N. W. 507, 508, we said:

"Deming was a bona fide mortgagee 'without notice,' and hence none of the liens here involved could attach and be prior to his mortgage. The mere knowledge by Deming that the erection of a new building upon the lot was in contemplation did not constitute the notice provided for in the statute. The words 'without notice' mean 'without notice of an existing lien.' "

The case of Brettschneider v. Wellman, 230 Minn. 225, 41 N. W. (2d) 255, is an example of a case in which work constituted an actual and visible beginning of the improvement on the ground. In that case we held that the excavation of a basement for a building was an "actual and visible beginning of the improvement on the ground" within the meaning of the statute, where there was no abandonment of the project, even though there was a short lapse of time between the date of excavation and the beginning of actual construction.

■ Finally, appellants contend that even if the mortgages assigned to Hartford and Monarch have priority over their liens, such priority extends only to the sum of $600,000 because, under the contracts between Schumacher and Phelps and Barac, that was all that Schumacher was obligated to advance. It is their contention that, even though the mortgages were for a total sum of $750,000, Schumacher was under no obligation to advance more than $600,000. They rest their case largely on a strict construction of the written contracts between Schumacher and Phelps and Barac. It is true that paragraphs 2 and 3 of the contracts, part of which we have quoted above, do state that Schumacher agrees to advance for use in the work of such construction and improvement on the property an amount not to exceed $280,000 on one lot and $320,000 on the other. It is equally true that Phelps and Barac and Schumacher all knew that the mortgages that were to be placed on the land for the purpose of completing the improvement aggregated $750,000. Surely the contract could not be construed so that Schumacher would be permitted to retain $150,000 without any obligation to use it for the improvement of the premises. Whether the payments of a mortgagee are obligatory or optional must be determined from the nature of the entire transaction. If we were strictly to decide this question on the ambiguous language of these documents we might well conclude that the obligation of Schumacher was to pay out only the sum of $600,000. But if we look at the whole transaction, the opposite conclusion is not only permissible but well-nigh compelling. The agreements between Schumacher and Hartford and Monarch contemplated that Schumacher would not engage in any long-term financing but that the insurance companies were to ultimately furnish the money needed for the improvement of the premises by purchasing the two mortgages for $350,000 and $400,000 respectively when the improvement was completed, which they did. Had Schumacher withheld advances when $600,000 had been expended, the building would not have been completed and Hartford and Monarch would have been under no obligation to purchase the mortgages. Unless other financing could be obtained, which would be doubtful in view of the encumbrances then existing against the property, the building would never have been completed. Even if it could be said

that Schumacher could stop at this stage as far as its agreement with Phelps and Barac was concerned, we think it is clear under the entire transaction that we cannot ignore the part that was to be played by Hartford and Monarch; and Schumacher was under an obligation to advance the full amount of the mortgages less its fees and expenses for the completion of the improvement of the property. Since Phelps and Barac clearly counted on eventual long-term financing by Hartford and Monarch, and since under this record Phelps and Barac could not have procured financing at all without these commitments, it requires no strained construction of the transaction to conclude that the advances by Schumacher up to the amount of the mortgages were obligatory. The trial court found that the advances were made under commitments on the part of Hartford and Monarch to purchase the mortgages, and it is clear that had the improvement not been completed they would have been under no obligation to do so.

It therefore follows that Schumacher was obligated to advance the necessary money if these commitments were to become binding. The facts are not unlike those in National Lumber Co. v. Farmer & Son, Inc. 251 Minn. 100, 105, 87 N. W. (2d) 32, 36, where we said:

"Finally appellants contend that the mortgage is not entitled to priority because the payments made by the bank were voluntary rather than obligatory. The court found and determined that the mortgage was given to secure future advances which were obligatory on the mortgagee. There is ample evidence in the record to support this finding. Where this is the case and where the advances are, in fact, later made, the mortgage takes priority over all mechanics liens which attach after the mortgage is given but before the advances are made."

There were 19 lien claimants involved in this action. Only 9 of them joined in the motion for amended findings or a new trial. All 19 have appealed. Respondents question the right of those who did not join in the motion to join in the appeal. In view of our decision on priorities we do not need to determine this question.

Affirmed.