R.B. THOMPSON, JR. LUMBER COM-
PANY, Respondent (C2–85–21, C4–85–
22), Appellant (C6–85–23, C7–85–46),

v.

WINDSOR DEVELOPMENT
CORPORATION, et al.,
Defendants,

Rothschild Financial Corporation, Appel-
lant (C2–85–21, C4–85–22), Respondent
(C6–85–23, C7–85–46), James L. Buck-
ingham, d.b.a. Buckingham Painting &
Decorating, Kullberg Manufacturing
Company, Respondents (C2–85–21, C4–
85–22), Appellants (C6–85–23, C7–85–46),

Turner Excavating Company, Respon-
dent (C2–85–21, C4–85–22),
Appellant (C6–85–23),

Eagle Wiring Company, Respondent
(C2–85–21, C4–85–22), Appellant
(C7–85–46),

Donald J. Booth, d.b.a. Dakota Blacktop-
ping, Thompson Plumbing Company,
Wooddale Builders, Inc., Respondents
(C2–85–21, C4–85–22), Appellants (C6–
85–23),

George Sedgwick Heating and Air Condi-
tioning Co., Inc., Respondent (C2–85–
21, C4–85–22), Appellant (C6–85–23, C7–
85–46),

Taping, Inc., Monson-Bell Bricklayers,
Inc., J & S Sod Service, Respondents
(C2–85–21, C4–85–22), Appellants (C7–
85–46).

Nos. C2–85–21, C4–85–22, C6–85–23
and C7–85–46.

Court of Appeals of Minnesota.

Sept. 17, 1985.

Review Denied Nov. 26, 1985.

James A. Fridland, Curtis D. Smith, Minneapolis, for R.B. Thompson, Jr. Lumber Co.

Peter J. McCall, Stapleton, Nolan & McCall, St. Paul, for Rothschild Financial Corp.

Curtis D. Smith, Wiese & Cox, Minneapolis, for lien claimants.

Heard, considered and decided by PARKER, P.J., and HUSPENI, and FORSBERG, JJ.

## OPINION

FORSBERG, Judge.

This is a consolidated appeal from judgments in four mechanics lien actions consolidated for trial.

In the Westhampton cases, C2–85–21 and C4–85–22, the trial court found that mechanics liens of the claimants were prior to mortgages held by Rothschild Financial Corporation [Rothschild]. Rothschild contends that the trial court erred in fixing the date of first improvement for purposes of priority, and that in any event the mechanics lien claims were not valid. We affirm.

In the Prairie East actions, C7–85–46 and C6–85–23, Rothschild mortgages were found to precede the liens. The lien claimants contend that the court erred in assigning priority based on a finding that the Rothschild loan advances were obligatory rather than optional. We reverse and remand.

## FACTS

Four separate parcels of real estate in two developments are involved in this appeal. All parcels were owned and developed by Windsor Development, which went out of business in October, 1983, and has made no appearance in these actions.

### Priority—date of first improvement

Westhampton was a quadraminium, or four-unit condominium development. For Lots 21 and 22 of Westhampton, the parties stipulated that the first visible improvement to the property preceded the filing of the mortgage.

The second Westhampton appeal, C4–85–22, involves Lots 27 and 29. The Westhampton subdivision was graded beginning in the summer of 1981. The surveyor testified that he certified the grading of individual sites, including building pads for each "quad" unit, in August of 1981. As part of this certification, he staked the corners of each building pad. Staking of the foundation dimensions, for purposes of excavation, was not done until March 24, 1983, a week following the filing of the Rothschild mortgage.

The trial court found that for Lots 27 and 29, the building pad staking was a visible improvement. Since there was no evidence these stakes had been removed prior to March, 1983, it concluded that the liens had priority over the Rothschild mortgages filed March 17, 1983.

The other subdivision, Prairie East Addition, was a single-family unit development. In the action involving Lot 6, the parties stipulated that no improvements had preceded the filing of the mortgage on June 4, 1982.

In the other Prairie East case, involving Lot 31, the excavator had no records or recollection as to dates of work on individual lots. He testified that he began grading work, including adjustment of previously constructed building pads, in September, 1979. There was no testimony from the surveyor as to when staking was done on Lot 31. The foundation was excavated on December 20, 1982. The first Rothschild mortgage on Lot 31 was filed in December, 1981, the second on December 17, 1982.

The trial court found that the first visible improvement on Lot 31 occurred on December 20, 1982, when the foundation was dug.

### Priority—optional or obligatory advances

Rothschild began providing construction financing to Windsor from Windsor's inception in 1974. Windsor provided Rothschild with its plans for the units to be built, and the parties would enter into a mortgage on a specific piece of property. The amount of the mortgage, however, was not immediately paid out. Rather, as Rothschild's vice-president testified, a "credit line" was

established for the amount of all mortgages.

In 1982, Rothschild instituted the "new documentation," which included a loan agreement. The loan agreement provided as follows:

No. 6. Subject to the following, lender agrees to advance the proceeds of the loan for the purpose above stated in accordance with the approved plans, specifications and sworn construction statement submitted to lender by borrower for the subject property. Lender will make advances periodically *at its sole discretion* and only upon receipt of written lender's request for payment form signed by borrower. [Emphasis added].

Although the previous documentation did not include the loan agreement, Rothschild's vice-president testified that the procedure had been the same.

When Windsor submitted a draw request, Rothschild paid out the amount requested, providing it did not exceed the undisbursed balance in that particular mortgage, and providing there was money left in the overall credit line. Rothschild did not require a certain percentage completion of the construction, nor did it require that the contractors were actually paid from the advances. In fact, Rothschild knew that in some cases subcontractors were not being paid from these funds, which were going to pay operating expenses, or interest owed to Rothschild on other mortgages. Rothschild did not make inspections of the properties, nor require lien waivers from materialmen.

The overall line of credit on Windsor projects reached $2–2 ½ million. Rothschild's vice-president testified that all of the mortgages in this case were fully disbursed.

### Validity of mechanics liens

Rothschild claims that virtually all of the subcontractors furnished last items of labor or materials solely intended to revive their expired lien rights. It argues that the lien claims were invalid.

A Windsor employee in charge of contracting the work out testified that towards the end of Windsor's operations, he talked to all the subcontractors about Windsor's financial condition. He admitted that he

probably told each and every one of them that the end was coming and that they should protect themselves * * * *.

He admitted to having given out field work orders at the request of subcontractors so they could protect their lien rights. He testified that this was work which had to be done at some point, but not necessarily at the time that he ordered it.

### ISSUES

1. Did the trial court err in determining the dates of first improvement on the individual lots?

2. Did the court err in determining that the loan advances were obligatory rather than optional on the part of the mortgagee?

3. Was there error in finding the mechanics liens valid where the last items of work furnished were nominal in amount?

4. Did the trial court err in determining the validity of individual lien claims?

### ANALYSIS

**1. Priority—date of first improvement**

The priority statute provides, in part, as follows:

As against a bona fide purchaser, mortgagee, or encumbrancer without notice, no lien shall attach prior to the actual and visible beginning of the improvement on the ground, * * * *. Engineering or land surveying services with respect to real estate shall not constitute the actual and visible beginning of the improvement on the ground referred to in this section, except when such engineering or land surveying services include a visible staking of the premises.

Minn.Stat. § 514.05 (1984). The date of first improvement is an issue as to Lots 27 and 29, Westhampton, and Lot 31 of Prairie East.

On the Westhampton lots, Rothschild contends that the staking of building pads done in 1981 was part of the overall project, and not directly identified with the individual buildings and therefore not properly counted as the first improvement. *See National Lumber Co. v. Farmer & Son, Inc.*, 251 Minn. 100, 105, 87 N.W.2d 32, 36 (1957) (fence erected to protect a tree from heavy machinery prior to excavation was not the beginning of the improvement).

■ The statute does not distinguish between staking of the building pad and staking of the foundation. *See* Minn.Stat. § 514.05. The staking of the building pad is sufficiently identified with the eventual erection of the building to constitute the first visible improvement.

■ The question of which work done or material furnished establishes the date of first improvement is a question of fact. *Kloster-Madsen, Inc. v. Tafi's, Inc.*, 303 Minn. 59, 64, 226 N.W.2d 603, 607 (1975). The trial court's findings cannot be disturbed unless clearly erroneous. *Enviro-Fab, Inc. v. Blandin Paper Co.*, 349 N.W.2d 842, 846 (Minn.Ct.App.1984). The court's finding as to the first improvement on Lots 27 and 29 was not clearly erroneous.

■ As to Lot 31 of Prairie East, the court dated the first improvement as of December 20, 1982, the date of excavation, making the liens subsequent to the Rothschild mortgages. The court could have assumed that the building pad was staked before grading in 1979, as was the custom in Westhampton. The claimants, however, had the burden of proving the date of first improvement, and could furnish only the vague testimony of the excavator. It was not clearly erroneous for the trial court to fail to make all inferences favorable to the lien claimants.

**2. Priority—obligatory or optional advances**

■ The trial court found that the loan advances covered by the Rothschild mortgages were obligatory rather than optional; therefore, the mortgages on the Prairie East lots had priority over the liens to the full amount of the mortgages and not merely the sums advanced up to the attachment of the liens. *Model Home Building, Inc. v. Turnquist*, 258 Minn. 53, 56, 102 N.W.2d 717, 719 (1960). The trial court explained its finding as follows:

On the face of the loan documents, Rothschild reserved discretion regarding the timing and conditions of advances on the loan but it did not retain the right to refuse to advance the full amount of the loan proceeds. The advances were therefore obligatory and not optional.

The supreme court has indicated:

Whether the payments of a mortgagee are obligatory or optional must be determined from the nature of the entire transaction.

*Reuben E. Johnson Co. v. Phelps*, 279 Minn. 107, 117, 156 N.W.2d 247, 253 (1968). In *Phelps*, the court held that although the loan agreement only required a loan of $600,000, it was clear from a related agreement providing that other financers were to take over financing by buying the mortgages at their face value of $750,000, that the entire sum of $750,000 was obligatory.

Rothschild's obligation was dependent upon the balance of the overall line of credit and the terms of its credit line agreement with Windsor. Rothschild's vice-president, however, testified that the company could choose not to advance money on a mortgage if there was no money left in the line of credit. His testimony generally established that Rothschild was more concerned with the line of credit, and Windsor's general financial condition, than with security on individual mortgages. Rothschild did not inspect properties to ensure that construction had progressed sufficiently to provide security adequate to the amounts disbursed on the mortgage, and did not require lien waivers or sworn construction statements. *Cf. Landers-Morrison-Christenson Co. v. Ambassador Holding Co.*, 171 Minn. 445, 449–50, 214 N.W. 503, 505 (1927) (advances conditioned on

requests for payment and receipt of lien waivers were obligatory).

Thus, we believe Rothschild's advances were not obligatory as to any individual piece of property, but were optional in nature, and had priority over the mechanics liens only for the amounts advanced up to the attachment of the liens. We remand for a determination of these amounts.

### 3. Validity of liens

Rothschild contends that the lien claims were invalid because the claimants' last items of labor were nominal in amount and furnished in order to protect their lien rights. It is generally held that items of labor or material which are nominal or insignificant in amount and furnished for the sole purpose of extending the time for filing of the lien are not considered in determining the filing deadline. *Kahle v. McClary,* 255 Minn. 239, 242, 96 N.W.2d 243, 246 (1959).

The supreme court has emphasized that the *sole* purpose of the last item must be to extend the filing deadline before it will disregard the item. *W.B. Martin Lumber Co. v. Noss,* 256 Minn. 471, 475, 99 N.W.2d 65, 68 (1959). Thus, the court has liberally construed the statute in favor of workmen and materialmen in determining the last item of improvement. *Rochester's Suburban Lumber Co. v. Slocumb,* 282 Minn. 124, 129, 163 N.W.2d 303, 307 (1968).

The controlling case here is *W.B. Martin Lumber Co.* In *Martin,* as here, the materialman had discussed with the contractor the matter of preservation of lien rights and thereafter delivered items insignificant in amount. The court held, however, that preservation of lien rights was not the sole purpose for the delivery. It noted that the contractor had ordered the materials and the materialman had a right to rely on the contractor's representation that they were needed. 256 Minn. at 475, 99 N.W.2d at 68. Here, Windsor's employee testified that he ordered the last items of work or materials and that they were needed.

### 4. Other issues

Rothschild also contends that R.B. Thompson's lien should have been dismissed because it failed to attach a bill of particulars to its complaint and that Taping, Inc.'s liens were invalid, in one case for exceeding the contract price, and in the other because the last item was furnished pursuant to a separate contract.

Rothschild's argument on the Thompson claim is without merit because the materials furnished by Thompson were furnished under a lump sum contract, *Minnesota Home Rebuilding & Repair Co. v. Kraulik,* 243 Minn. 312, 314, 67 N.W.2d 673, 674 (1954), and because Rothschild did not move in the trial court for an order requiring a more detailed statement. *Minnesota Wood Specialties, Inc. v. Mattson,* 274 N.W.2d 116, 120 (Minn.1978).

Taping divided the total amount owed it by Windsor among the properties on which it was filing liens. Thus the amount claimed on any one lien might exceed the amount due it for work on that property. We believe it was not an "intentional demand for an amount in excess of that due," *Delyea v. Turner,* 264 Minn. 169, 175, 118 N.W.2d 436, 440 (1962), to claim amounts that were owed by the owner but not for work on that property.

The other issue regarding Taping's claims is whether its last items were pursuant to a separate contract. The last items were "touch up work" done on the drywall after work by other subcontractors. This was "repair" work as distinguished from the original construction, *see, New Prague Lumber & Readi-Mix Co. v. Bastyr,* 263 Minn. 249, 258, 117 N.W.2d 7, 13 (1962) (repair of unoccupied building followed by construction of addition); however, it was repair occasioned by the ordinary process of construction and still within the construction phase of the life of the building. The trial court's finding that this work was a continuation of the contract was not clearly erroneous.

## DECISION

The trial court did not err in finding the mechanics liens on the Westhampton lots (C2–85–21 and C4–85–22) prior to the Rothschild mortgages. There was no error in finding the lien claims valid. Advances secured by the mortgages, however, were optional rather than obligatory, and preceded the mechanics liens only for amounts actually disbursed up to the attachment of the liens. We remand for a determination of these amounts.

Affirmed (C2–85–21 and C4–85–22).

Reversed and remanded (C6–85–23 and C7–85–46).