529 N.W.2d 506 (1995)
POURED CONCRETE FOUNDATION, INC., Plaintiff,
v.
ANDRON, INC., et al., Defendants,
Construction Mortgage Investors, Inc., Respondent,
Dura Supreme, Inc., et al., London Brick, Inc., Appellants.
No. C8-94-1875.
Court of Appeals of Minnesota.
April 11, 1995.
Review Denied May 31, 1995.
*508 James A. Beitz, Hagerty, Johnson, Albrightson & Beitz, P.A., Minneapolis, for respondent.
Vincent J. Fahnlander, Curtis D. Smith, Moss & Barnett, P.A., Minneapolis, MN, for appellants Dura Supreme, Inc.
Reese Chezick, Hastings, for appellant London Brick, Inc.
Considered and decided by PARKER, P.J., NORTON and SCHUMACHER, JJ.

OPINION
NORTON, Judge.
Appellant lien claimants contend the trial court erred in invalidating their mechanic's liens. They argue their work on a home relates back to the date of the original excavation of the lot. We agree and reverse.

FACTS
Defendant Andron, Inc., is a development company comprised solely of Richard Andron, owner, architect, developer. In two transactions that occurred in November 1987 and June 1988, Andron purchased two pieces of real estate in Edina now identified as Lots 1-8, Block 1, Interlachen Bluff, County of Hennepin, State of Minnesota. Andron received financing for this purchase from Shelard National Bank. At the time of purchase, two older homes existed on this land. Andron intended to demolish them and develop the land into new residential properties. Specifically, Andron intended initially to build one house on lot 7 and use it as a model home to sell the remaining seven lots.
The City of Edina granted Andron permission to plat and divide the land into eight residential lots. The agreement between Andron and Edina required Andron to clear, grub, and grade the subdivision to make eight buildable lots, and to create streets, curbs, gutters, and building pads. The development required substantial excavating and grading in order to create buildable lots. Andron hired the engineering firm of Krueger and Associates to create the grading plan for the subdivision.
Once Andron received approval from the City of Edina, he hired Kevitt Excavating to cut in the road, grub and grade the subdivision, and create building pads for each future home. Kevitt had prepared land for 24-36 homes for Andron before this project. Scott Kevitt testified that he and Andron had one contract for the subdivision development work, which occurred in the summer and fall of 1988 and included constructing the building pads on the lots, and a separate contract to dig the basement for the home on lot 7 which began in early 1989.
In the fall of 1988, Andron applied to respondent Construction Mortgage Investors (CMI) for financing to build the home on lot 7. Before approving the loan of over $500,000, Ron Allar of CMI inspected the entire subdivision and, in particular, lot 7. Allar testified that when he viewed the property, the site grading was substantially complete, the lots had been "balanced," and he assumed that the building pads had already been "corrected." CMI closed on the loan with Andron on November 17, 1988 and recorded its mortgage the same day. Allar testified that CMI protected itself from potential lien claimants by purchasing title insurance.
Throughout 1989, the following lien claimants, whose claims are on appeal here, worked on the home on lot 7: The Stephen Donnelly Company did the lathe and stucco work; Woodlake Cement Construction Company provided cement for the pool, deck, and steps; London Brick provided the masonry work and materials; Northwestern Tile and Marble provided ceramic tile and marble for the interior of the home; Dura Supreme, Inc. provided cabinets and vanities; and Creative Lighting, Inc. provided lighting fixtures. Upon completion of the home on lot 7, Andron was owner and occupant. Despite Andron's efforts, the home did not sell.
After CMI foreclosed the mortgage, CMI purchased the home for $617,551.36 at a sheriff's sale on April 16, 1991. Andron, who continued to live in the home during the six *509 month redemption period, failed to redeem the property.
This case is a continuation of that mortgage foreclosure action. A bifurcated court trial began in 1991 to consider first the priority of the liens, and then the validity of the liens. In order to gain priority over CMI, the lien claimants sought to prove that their liens related back to the first visible improvement to lot 7, to wit, the excavation of the site, which occurred before CMI loaned Andron the money and recorded its mortgage. After the close of the lien claimants' case, the court found the excavation work had not been an improvement to lot 7, the excavation was separate and distinct from the lien claimants' work on the house, and CMI's mortgage had priority. Based upon those findings, the court granted CMI's motion for involuntary dismissal.
On appeal, this court reversed and remanded, ruling that the excavation was the first visible sign of improvement to lot 7 under Minn.Stat. § 514.05, subd. 1 (1990). Poured Concrete Foundations, Inc. v. Andron, Inc., 1992 WL 166694 (Minn.App.1992), pet. for rev. denied (Minn. Sept. 30, 1992) (Poured Concrete I). The court also noted, "Kevitt's work was admittedly noticed by CMI in its pre-loan inspection and many of its aspects pertained only to construction of the house on lot 7." Id., slip op. at 5.
On remand, CMI moved to complete the trial on the priority issue. The trial court denied this motion without explanation. When CMI appealed that decision, this court reversed again, holding that CMI retained its right to present evidence on the priority issue now that the initial involuntary dismissal had been reversed. See Poured Concrete Foundations, Inc. v. Andron, Inc., 507 N.W.2d 888, 891-92 (Minn.App.1993) (trial court dismissed case before CMI had opportunity to present evidence), pet. for rev. denied (Minn. Jan. 27, 1994) (Poured Concrete II).
During the remainder of the bifurcated trial, CMI presented evidence regarding the separate and distinct issue, and then all parties presented evidence regarding the amount and validity of their mechanic's liens. The trial court ruled in favor of CMI, finding that the lien claimants' work on lot 7 was separate and distinct from the excavation work on the lot, that CMI's mortgage had priority to the mechanic's liens, and that London Brick's lien was invalid because it had performed its last item of work for the sole purpose of extending the time to file its mechanic's lien. The court later denied the lien claimants' motion for amended findings or a new trial.

ISSUES
1. Did the trial court abuse it discretion when it found the subdivision improvements separate and distinct from the home improvements so as to prevent appellants from relating their liens back to the initial date of excavation on the land?
2. Does the record support the trial court's finding that London Brick attempted to extend its lien rights when it washed the brick on the house in 1991?

ANALYSIS

1. Separate and distinct improvements
Our first task is to determine our scope of review. Appellants claim this court has already "determined as a matter of law" that the excavation and construction of the building pad "was part of a continuous project to construct a house" on lot 7. Consequently, because this case is now on its third appeal, appellants contend that prior "ruling" is now law of the case. We cannot accept this interpretation for three reasons.
First, we have already declined to apply the law of the case to this issue. See Poured Concrete II, 507 N.W.2d at 891 (although appellant raised law of case argument, court recognized CMI's right to present evidence relating to priority of liens and implicitly recognized that separate/distinct issue was still open for debate).
Second, in Poured Concrete I, this court's only holding was that, under the plain language of the mechanic's lien statute, the excavation was the first visible improvement on the subdivision and, in particular, on lot 7. See Poured Concrete I, slip op. at 4.
*510 Third, the language upon which appellants rely was not a "ruling" from this court. Appellants focus upon the court's closing comments in Poured Concrete I:
Kevitt's work was admittedly noticed by CMI in its pre-loan inspection and many of its aspects pertained only to construction of the house on lot 7.
Id., slip op. at 5. The court made these comments based upon the evidence in the appellate record at that time: the lien claimants' case-in-chief and CMI's cross-examination. That evidence focused on the connection between the excavation of lot 7 and the construction of the home there. In Poured Concrete II, 507 N.W.2d at 892, this court ruled that, despite the weight of the lien claimants' evidence, CMI had a right to present its case on the priority issue.
Given this procedural history, it was incumbent upon CMI upon remand of Poured Concrete II to present evidence in its case-in-chief that refuted the evidence of one continuous project that the lien claimants had presented in Poured Concrete I. For purposes of our review, then, we will focus on CMI's evidence in the second trial as compared to the lien claimants' evidence in the first trial to determine whether that evidence supports the trial court's findings. Although "[t]he issue of lien priority involves interpretation of the mechanics' lien statutes," which is a legal question that we review de novo, we will not overturn the trial court's findings of fact unless clearly erroneous. Kirkwold Constr. Co. v. M.G.A. Constr., Inc., 498 N.W.2d 465, 468 (Minn.App.1993), aff'd, 513 N.W.2d 241 (Minn.1994).
Appellants assert that the record does not support the trial court's findings and conclusions that their work was separate and distinct from the excavation work done before CMI recorded its mortgage. We agree.
The court considers construction work to be one single improvement if it serves the same general purpose or if all the parts form one single improvement. Witcher Constr. Co. v. Estes II Ltd. Partnership, 465 N.W.2d 404, 407 (Minn.App.1991), pet. for rev. denied (Minn. Mar. 15, 1991). The court considers construction projects separate improvements if "little or no relationship" exists between the underlying contracts. Id. To evaluate the projects, we focus on the parties' intent, what the contracts covered, the time lapse between projects, and financing. Id.
The evidence in the record demonstrates the parties' unity of purpose and planning when developing lot 7. From the outset, Andron, who was the property owner, developer, architect, and builder, planned to build the home on lot 7 as a model home for the sale and development of the other lots in the subdivision. Kevitt Excavating understood that purpose. Scott Kevitt testified that the initial excavating contract for the subdivision included grading lot 7 and preparing the building pad for the home. The lien claimants presented this evidence at the first trial. CMI did not question either Andron or Kevitt about the separate and distinct issue. This record demonstrates that both parties intended one continuous project from excavation to construction of the home on lot 7.
Under the initial contract, Kevitt excavated the entire subdivision and prepared a building pad for lot 7. Andron and Kevitt testified that they later made a separate agreement to dig the foundation and basement for the home, and that they kept separate files and sent separate bills. Those separate records for the basement are not relevant to the relationship between the initial excavation and the home, however, because we are focusing on the initial excavation and building pad completed on lot 7. The initial contract covered both of those projects.
The record also shows that no substantial amount of time lapsed between initial grading of the subdivision and lot 7 and excavation of the home site. Kevitt excavated the subdivision and prepared the building pad on lot 7 in the summer and fall of 1988. Andron, who had been refining his plans and soliciting bids for the home on lot 7 during initial excavation, received financing for the home in November 1988. In December 1988, Kevitt returned to lot 7 to dig the basement and foundation for the home. CMI did not *511 present any evidence to refute this narrow time sequence.
Finally, it is undisputed that Andron received financing for his home on lot 7 from a different lender than had financed the purchase of the subdivision. This fact does not weigh heavily because we are focusing on the stages of development of lot 7, not on the initial purchase of the subdivision.
Based on this evidence, we cannot say that "little or no relationship" existed between the underlying contracts. See Id. (improvements are separate if no relationship exists between contracts). On the contrary, these Witcher factors reveal that the construction on lot 7 was actually one continuous improvement because Andron and Kevitt had a unified plan and purpose when they began excavating the subdivision and, specifically, lot 7. See id. (construction work is one single improvement if it serves same general purpose).
On remand from Poured Concrete II, CMI presented no new facts regarding the separate and distinct issue that had not been presented in Poured Concrete I. The trial court erred in disregarding the procedural history and substantive holdings that created the context for the trial on remand. For this reason, the trial court's findings and conclusions at the end of the bifurcated trial are without support in the record and are clearly erroneous. Indeed, two of the court's findings are contrary to this court's holding in Poured Concrete I. The trial court here found:
34. Kevitt's excavation work furnished the first visible item of material and labor for the Lot 7 construction project in December, 1988.
* * * * * *
47. There was no actual and visible beginning of the improvement on the ground of Lot 7 to which the Lien Claimants contributed prior to November 17, 1988.
In Poured Concrete I, this court held that the initial excavation and construction of the building pad on lot 7 was the first visible improvement. That determination is without challenge and stands as law of the case. See Sigurdson v. Isanti County, 448 N.W.2d 62, 66 (Minn.1989) (prior determination may not be re-examined on second appeal).

2. London Brick
London Brick did the masonry on the lot 7 home from May-July 1989. Both Andron and Marshall Bell of London Brick testified that the acid wash treatment was a standard cleaning process that London Brick performed on the majority of its projects and expected to perform here. Bell sent Andron an invoice for the project on September 30, 1989; the invoice listed the materials and labor furnished on the home; it did not list the acid wash. Bell testified that his crews then began working on other homes Andron was building in the Interlachen Bluff subdivision.
In July 1991, as Andron was still attempting to sell the home on lot 7, he asked Bell to acid wash the brick in order to clean it up and make the home more attractive to the prospective buyers. London Brick obliged; the acid wash took three days' work. Once that was completed, Bell submitted mechanic's liens for the work done on the home from May 1989-July 1991.
The trial court invalidated London Brick's lien based upon its finding that London Brick had acid-washed the brick under a separate agreement intended only to extend the time to file a mechanic's lien.
The law is clear that a lien may attach on the last date that a contractor supplies labor for a project. Minn.Stat. § 514.08, subd. 1 (1990); Enviro-Fab, Inc. v. Blandin Paper Co., 349 N.W.2d 842, 846 (Minn.App.1984), pet. for rev. denied (Minn. Sept. 12, 1984). When calculating the deadline to file a mechanic's lien, the court disregards nominal or insignificant amounts of labor performed for the "sole purpose" of extending the filing time. R.B. Thompson Jr. Lumber Co. v. Windsor Dev. Corp., 374 N.W.2d 493, 498 (Minn.App.1985) (emphasis in original), pet. for rev. denied (Minn. Nov. 26, 1985). The court liberally construes section 514.08 "in favor of workmen and materialmen in determining the last item of improvement." Id. For that reason, the court generally considers separate orders or deliveries under the same estimate to be "related *512 parts of an entire contract" for purposes of filing a lien. Rochester's Suburban Lumber Co. v. Slocumb, 282 Minn. 124, 129-30, 163 N.W.2d 303, 307 (1968).
Appellants contend the acid wash was part of the overall contract London Brick had with Andron. The record supports that contention. Bell and Andron had worked together for 10-12 years. Despite the two-year delay in acid-washing the brick house on lot 7, the acid wash was a customary process on jobs between Andron and London Brick. See New Prague Lumber & Readi-Mix Co. v. Bastyr, 263 Minn. 249, 256-57, 117 N.W.2d 7, 12 (1962) (when work done at different times forms an entire project or parties contemplated only one project, court must consider it one contract). London Brick performed the acid wash in 1991 upon Andron's request to prepare the home for sale, not on its own motivation to extend the lien period. Furthermore, the acid wash was not a nominal or insignificant project; London Brick worked three days to complete the acid wash. See R.B. Thompson Jr. Lumber Co., 374 N.W.2d at 498 (court disregards nominal labor performed only to extend lien period); Cf. George Sedgwick Heating & Air Conditioning v. Riverwood Cos., 409 N.W.2d 289, 291 (Minn.App.1987) (safety test that took "little time or skill to perform" was a "trifling amount" of work that did not extend time to file lien when contractor had completed installation four months earlier and was under statutory mandate to do safety test at time of installation). The record contains no evidence to support the trial court's finding that London Brick intended to extend the lien period. That finding is clearly erroneous and warrants reversal. The acid wash was part of the original contract. London Brick's mechanic's lien for work provided on lot 7 attached the last day it washed the brick. Minn.Stat. § 514.08, subd. 1.

DECISION
CMI failed to produce any evidence in its case-in-chief that differed from or refuted the evidence the lien claimants had presented in Poured Concrete I. Thus, the trial court's findings regarding the continuous nature of this construction project contradict the ruling of this court in Poured Concrete I and have no support in the record.
The lien claimants' work relates back to the original excavation of lot 7 and, consequently, predates and takes priority over CMI's recorded mortgage. London Brick's mechanic's lien is valid because the acid wash on the lot 7 home was part of its original contract with Andron.
Reversed.